## THE EMANCIPATION PROCLAMATION CASES.

### W. M. HALL v. T. M. KEESE.
### DOUGHERTY v. CARTWRIGHT.

MORRILL, C. J.—The constitution of the United States provides that "no person shall be deprived of * * property without due process of law;" that "congress shall have power to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;" "to raise and support armies;" and "make rules for the government of the land and naval forces." So that if the people of Texas were citizens of the United States during the rebellion they could not be deprived of their property without due process of law. If they were a part of another state or a *de facto* government, and they and their property were captured by the forces of the United States, it belonged to congress and not the commander-in-chief of the army to make rules concerning those captures. In either case the proclamations, military orders, or whatever else they may be called, can have no force or effect upon any other than the men subject to the commander, unless such proclamations and orders are based upon an act of congress.

The powers of government are distributed into three co-ordinate branches. There is no majesty except the majesty of the law.

The right to condemn or confiscate the property of enemies rests not upon the declaration of war or upon modern usage, but legislative will, to be found in acts of congress; and if there be no such legislation, the power of condemnation does not exist. (Livingston v. Moon, 7 Pet., 546; Brown v. The United States, 8 Cranch, 110.)

The power to declare war includes the exercise of all the ordinary rights of belligerents, and congress may therefore pass suitable laws to embrace them. But until laws of condemnation have been passed, no private citizen can enforce any such rights, and the judiciary is incapable of giving them any legitimate operation.

But the congress of the United States have declared their will as to the disposition of slaves. As early as the 6th of August, 1861, and the 17th day of July, 1862, the congress of the United States passed "An act to confiscate property used for insurrectionary purposes," and "An act entitled an act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes." (11 Stats., 589.) The 9th section of this last act provided, that "All slaves of persons who shall hereafter be engaged in rebellion against the government of the United States, &c., escaping from such persons and taking refuge within the lines of the army, and all slaves captured from such persons or deserted by them and coming under the control of the government of the United States, shall be

deemed captives of war, and shall be forever free of their servitude, and not again held as slaves." This, as well as all the other sections of the act, was prospective, and the fourteen different sections of the act contain full and ample "rules concerning captures on land and water." The congress, by this act, virtually negatives the power of any other branch of the government to do what the constitution authorizes that body alone to do. The act specially declares the slaves captives of war, and bases their freedom on the fact that their owners "were engaged in rebellion against the government of the United States," and it does not free any others. This same act, in the 7th and 8th sections, contemplated "due course of law" against the owners of the property, and of course the freedom of the slave was dependent upon the disloyalty of the owner, as found by the court.

As the proposed XIIIth amendment to the constitution was passed by congress on the 1st day of February, 1865, and as it is to be presumed that the congress supposed that the requisite number of states would ratify it, which was really done previous to the 18th December, 1865, hence there was no necessity to convict their owners of treason to free the slaves. By this amendment not only the slaves of the disloyal, but of the loyal also, were free, and on the 18th of December, 1865, slavery ceased to exist, and freedom was established coextensive with the United States.

This proclamation was a war measure, and did not operate presently upon the slaves. It was not founded in the constitution, and it was duly claimed for the commander-in-chief of the armies.

In the case before the court, the vendor, in January, 1865, sold and delivered a slave to the vendee, who in consideration thereof executed a promissory note for the payment. In the other case, a slave at the same time was hired for a year, and a promissory note given in consideration of the hire. As there was nothing illegal in the transaction, the notes were not void for illegality. 'The consideration is represented as having failed. It is not pretended that at the time of the contract there was no consideration. Each party had the same means of knowing the future condition of the slave, and acted upon his own ideas as to the result of the war. That the cause which proved mortal to slavery would soon sweep over the land, was apparent to some and disbelieved by others. There was, however, no breach in the contract on the part of the vendor at the time of the sale. And though the vendor guarantied the subject of sale, a slave for life, and the slave in the same year was made free by the superior power, inasmuch as at the time the sale was made he was a slave for life, yet, if his freedom was occasioned afterwards, not by the vendor, but by the sovereign power of the nation, the vendor did not violate his contract.

The question is, who was the owner at the time the slave became free? "*Res perit suo domino.*"

The pecuniary loss must be borne by those who were the owners of such slaves at the time of their emancipation; for the emancipation of the slaves during the year was the artificial death of the slaves, and operated as would their

natural death; therefore the defendant is liable for the hire during the whole year. The loss in the other case was a *vis major*, and it fell upon the vendee, who was in possession, and not upon the vendor, to whom the note for the price was due.

Lɪɴᴅsᴀʏ, J., concurred.—Slavery did exist in fact and in law until its overthrow by the actual force of the national arms. It originated in force; it was destroyed by force.

The effect of the President's proclamation was to liberate the slaves under the national control, and to pledge the faith of the government as to the remainder. The liberation was the effect of capture.

The proclamation could not, *proprio vigore*, manumit the slaves. It required the power of the conquering forces. The liberation in Texas took effect from the date of the surrender of the insurgent forces, and the proclamation of that fact by the commanding general, dated 19th June, 1865. By general understanding, that was the day of jubilee of the freedom of the slaves in Texas. Until this final surrender in Texas, the traffic in slaves was lawful.

The destruction of slavery was a *vis major*, and those in possession at the final application of the power had to sustain the loss.

It is not conceded that the XIIIth amendment was necessary to destroy slavery in the revolted states. This was settled by the surrender. This amendment finished the work throughout the entire nation.

The notes being given after the proclamation in 1863, but before the 19th June, 1865, were recoverable.

Lᴀᴛɪᴍᴇʀ, J., concurred.—[The clerk informs the *Reporter* that Latimer's opinion had unfortunately been lost.]

Hᴀᴍɪʟᴛᴏɴ, J., dissented.—The real question is, Was a sale of negroes in Texas after the 1st of January, 1863, opposed to the solemnly declared will and policy of the United States government, and had they the right, under existing circumstances, to declare such policy? If these questions are to be answered in the affirmative, then it is unnecessary to do more than add, that they should receive no aid from loyal courts to carry them into execution.

By the terms of President Lincoln's proclamation of January 1, 1863, the high purpose of the government was, in solemn form, made known to the citizens of the government and to the nations of the earth, that slavery should cease in the states and districts which it embraced, provided effect could be given to it by force of arms; and that this declaration of purpose was authoritative and warranted by the constitution as a measure of war, and was carried into full effect by the success of the national arms.

From the fact of a civil war and a *de facto* government here in Texas, I deduce the right of the national government to declare and effect the emancipation of the slaves.

War is that state in which a nation prosecutes its right by force Civil war includes every war between one and the same political society. In such a war, the parties are forced to accord to each other the rights of belliger-

ents; and to such wars the public laws of nations are in many respects applicable.

After the recognition of the Confederate States by the proclamation of the Queen of England, of the 13th May, 1861, as belligerents, a citizen of a foreign power is estopped to deny the existence of a war, with all its consequences, as regards neutrals. They cannot ask a court to affect a technical ignorance of the existence of a war which all the world acknowledges to be the greatest civil war known in the history of the human race, and thus cripple the arm of the government and paralyze its power by subtle definitions and ingenious sophisms. (The Prize Cases, 2 Black, 669.)

After quoting largely from the Prize Cases, the judge says: From these authorities, which I have so freely quoted, and from my knowledge of the character, magnitude, and duration of the war, the manner in which it was conducted by the parties engaged in the contest, with all the prominent incidents connected with it to its close—of which, as a matter of public history, I must take judicial knowledge—I am at no trouble to determine that it was a "civil war" of vast proportions, in which the contesting parties respectively were entitled to and were accorded all the rights of belligerents, according to the established public law of nations; and, as resulting from this necessarily, that the successful belligerent may rightfully claim and exercise all the powers accorded to a conqueror under the laws of war.

A government in fact was erected, complete in the organization of all its parts, with sufficient resources of men and money to carry on a civil war of unexampled dimensions. * * The so-called Confederate States were in the possession of many of the highest attributes of government.

The revolting states did practically, not legally, withdraw from the Union by severing their political connection with it; they did expel from their limits the flag of the United States, her courts and officers, civil and military, and erected a new government in its stead, with a constitution, a president, a congress, a judiciary, and officers, state and confederate; organized vast armies, equipped and put them in the field, and for four years contested the palm of final victory with the United States on more than three hundred bloody fields, in a war which is admitted to have been the most gigantic of modern times. It is too late for those who were engaged on the Confederate side to insist now that they have always been in the Union, and that, therefore, the condition of the revolting states has not been changed.

It is too late for the United States to dispute the fact of secession, or a partial disruption of the government in the revolting states during the period of the war.

In the meantime it must be remembered that the United States government lost none of her rights, authority, or jurisdiction over the territory and people of the insurgent states by reason of their withdrawal; she was only prevented by force for a time from exercising them.

The rebellion was carried on in the interest of slavery. It was in fact a contest between freedom and slavery, and which demanded every energy and resource which the executive possessed or could command to sustain even the existence of the government; and after long deliberation and advice it was determined to make war upon slavery.

After reciting the preliminary proclamation of the 22d of September, the proclamation of the 1st of January, 1863, he proceeds: "Now, therefore, I, Abraham Lincoln, President of the United States, by virtue of the power in me vested, as commander-in-chief of the army and navy of the United States, in time of actual armed rebellion against the authority and government of the United States, and as a fit and necessary war measure for suppressing said rebellion, do, on this 1st day of January, 1863, and in accordance with my purpose so to do, publicly proclaimed for the full period of one hundred days from the day first above mentioned, order and designate, as the states and parts of states wherein the people thereof respectively are this day in rebellion against the United States, the following, to wit," (then mentioning the states and parts of states, including Texas,) proceeds: "And by virtue of the power and for the purpose aforesaid I do order and declare, that all persons held as slaves within said designated states and parts of states are, and henceforward shall be, free;" and then this noblest paper since the declaration of independence by our forefathers, and which, like that, was to be sustained and enforced at the cost of blood and treasure, concludes with this solemn assertion and invocation, "and upon this act, sincerely believed to be an act of justice, warranted by the constitution upon military necessity, I invoke the considerate judgment of mankind and the gracious favor of Almighty God."

The war powers in the constitution cited.

It is a well-established rule of the public law of nations that "from the moment one state is at war with another it has, on general principles, a right to seize on all the enemy's property, of whatever kind and wheresoever found, and to appropriate the property thus taken to its own use or to that of the captors." (Lawrence's Wheaton's Int. Law.)

This proclamation of emancipation, thus warranted by the laws of war, fully expressed the will of the United States government, as a belligerent, upon the subject embraced in it. It was, that from and after that date the former slaves in the insurrectionary states and districts (including Texas) should thenceforth be forever free.

The proclamation depended upon the success of the arms of the United States. But they did succeed, and that gave it effect from its date.

After the proclamation, to engage in the traffic of slaves was to violate the public policy of the United States. It was an illegal dealing, about which neither party will receive relief.

The question here is, not as to the moment of time when the former slaves in Texas actually obtained their freedom by the events of the war, but it is whether now the courts will aid in carrying out and enforcing contracts

against the public policy of the government, pronounced in the most solemn form, as both sovereign and belligerent, in a great civil war.

The XIIIth amendment applied to those states and parts of states not embraced in the president's proclamation.

CALDWELL, J., concurred in the dissent of HAMILTON, J.

APPEAL from CALDWELL. The case was tried before Hon. J. J. THORNTON, one of the district judges.

These cases, like several others found in the volumes of this *Reporter*, in coming ages, will be referred to as a chapter in the history of great events. Read in connection with Bishop v. Jones & Petty, 28 Tex., 294; the Sequestration Cases, 30 Tex., 688; the Stay-Law Cases, Jones v. McMahan & Gilbert, 30 Tex., 719; the great case of Texas v. White & Chiles, 25 Tex. Supp., 465, (Texas Bond case;) and others of like character, they will convince the antiquarian of future years that some generations make history so rapidly that they do not understand it themselves.

The secession movement was one avowedly in the interest of slavery. Deeper down and below this there were motives in the minds of many to establish an absolute and arbitrary government. But the great masses had been educated up to the belief that the people in the nineteen states where African slavery did not exist were faithless to their obligations to the constitution, and that at some time or other they would manumit all the slaves of the land. No one could foresee the mode, but the sentiments constantly avowed against the institution were received as proof of the desire and purpose. The election of President Lincoln was seized upon as the occasion to "fire the southern heart" and to dissolve the Union. The possession of the state governments by the extremists made the forms of dissolution very simple. The governors convened the legislatures; the legislatures authorized the election of conventions, which passed secession ordinances and elected delegates to a convention at Montgomery; these men agreed upon a new union, which they called the Confed-

erate States of America; they organized a national government and put the new machine in motion. The delay in Texas, owing to the opposition of Governor SAM HOUSTON, was exceedingly irritating. He delayed calling the legislature in special session, although severely pressed by newspapers, town meetings, and even many of the unionists, who elected him, to do so. One member of the legislature actually issued a proclamation, inviting the legislature to assemble without waiting the call of the governor. Sixty-one gentlemen, who "chanced to be at Austin," issued a proclamation for the election of delegates to a convention. Yielding to the threatening circumstances, the governor convened the legislature in "extra session," and that body legalized the call of the convention. The convention, as was its purpose, passed a secession ordinance, which was submitted to the people amidst an incipient war, during which all the United States forces "surrendered," or were captured, and it was carried by an overwhelming majority. (Paschal's Dig., pp. 78–81, 86 *et seq.*, and note 216.)

During the discussions of that day and for thirty years previous, the southern press, the pulpit, the stump orators, the family circle, and every instrument of public sentiment had taught the blacks as well as the whites that a contest was coming which would either destroy slavery or render it perpetual. Restrictions had been imposed upon manumission. The free persons of color had been driven from several states. In others, including Texas, laws had been provided for the re-enslavement of those who had become free. Yet, in the face of all this, the influences of kindred ties, or other causes of conscience, induced some slave-owner occasionally to manumit his slaves by last will and testament. The secession convention sought to put a perpetual stop to this by the following amendments to the constitution, article VIII:

"SEC. 1. The legislature shall have no power to pass laws for the emancipation of slaves.

"SEC. 2. No citizen or other person residing in this state shall have power, by deed or will, to take effect in this state or out of it, in any manner whatsoever, directly or indirectly, to emancipate his slave or slaves.

"SEC. 3. The legislature shall have no power to pass any law to prevent immigrants to this state from bringing with them such persons of the negro race as are deemed slaves by the laws of any of the Confederate States of America: Provided, that slaves who have committed any felony may be excluded from this state." (Paschal's Dig., Art. VIII, pp. 69, 70.)

But "Man proposes and God disposes." The war came, and it ended; the stone which had been laid as the chief of the corner was dashed to pieces; the fabric fell, and slavery was destroyed. The strong man, who had bowed at the pillars of the temple, had so shattered the edifice and so deeply buried the princes, who had feasted in the belief that all was well until the last hour, that those who survived to mourn the fall were as much confused as to the time of the real catastrophe, as were the four million servitors, who emerged from the funeral pile, to find no masters to command them.

In the confusion little was thought of except to hurry to the provost marshals and other officials, and to take the amnesty oath proclaimed by President Johnson, in which oath all swore that they would respect the laws and proclamations which had destroyed slavery, and never more assert the right of property in man.

Those who had been loudest to proclaim their purpose to perish in the defense of slavery were the first to reach the provost marshal's and the loudest in their responses to the manumission oath. Then they hurried back to contrive some plan to retain the services of those whom they had owned. The negroes stood aghast, not knowing whether most to trust their old masters or their liberators. On the 1st of January, 1863, President Lincoln had proclaimed the universal emancipation of the slaves of the insurgents. This proclamation was necessarily partial. When General Granger entered Texas, in 1865, he proclaimed the negroes free. The proclamation of Provisional Governor Hamil-

ton was to the same effect. The amnesty oaths, already referred to, seemed to seal it. The people of Texas had seen the final downfall of the "southern confederacy" on the 25th of May, 1865. The simultaneous revolt of all the Confederate soldiers against their officers; the division of the vast property of that defunct corporation among the disbanded; the return of those from the conscription worse than the slavery in which the African descendants were held; and the surrender and flight of Smith, Magruder, many of their subalterns, and the heads of the civil government, to Mexico and other foreign lands, had marked the downfall of the resisting power. There was a forced consent that the negroes had become free. But *when* had they obtained their freedom? *What* was the effect of that freedom upon thousands of existing contracts for their sale and hiring? Here were grave questions for the lawyers. And no sooner were the courts organized than the records were filled with these questions. The freedmen had little interest in their solution. Four millions of people, without property, money, education, or self-confidence, had gone forth amidst those who had greatly transferred their resentment from their conquerors to this race.

The questions were presented in different cases, but some of them without argument. The immediate points in this case were, did the manumission of the slaves terminate the contract for hiring? and, if so, from what date? There were also suits which involved the validity of sales made after the 1st January, 1863.

The court invited arguments. The cases were argued by *Geo. W. Paschal* and *Charles S. West* in favor of the validity of the contracts for hiring and for sales previous to the actual downfall of slavery.

Argument of *Geo. W. Paschal.*—I. We are invited to discuss the very question, what was the effect of President Lin-

coln's proclamation of the 1st day of January, 1863, upon negro slavery in Texas?

On the 22d of September, 1862, President Lincoln issued a proclamation, notifying his intention, on the 1st day of January thereafter, to designate the states, in which the people should then be in rebellion, where freedom should be declared to the slaves. (Sayles' Treat., § 844.)

This proclamation recited the acts of the 13th of. March and the 17th of July, 1862, against the return of fugitive slaves. (Sayles' Treat., § 844.) It is thus shown that the proclamation stood upon no other act of congress. On the 1st of January, 1863, the President issued his proclamation of that date, in which he declared, among other things, that, as to Texas, "All persons bred as slaves are and henceforward shall be free; and that the executive government of the United States, including the military and naval authorities thereof, shall recognize and maintain the freedom of such persons." (Sayles' Treat., p. 526, § 844.)

It is historically known that all semblance of authority of the United States was withdrawn from Texas, with the mails, in June, 1861, and that this condition of things, except as to a margin of some counties along the coast, remained, until General Gordon Granger's order of the 19th of June, 1865. (Sayles' Treat., § 847.) In this General Granger says: "The people of Texas are informed that, in accordance with a proclamation from the executive of the United States, all slaves are free."

President Johnson's amnesty oath of the 29th of May, 1865, contained this clause: "And that I will, in like manner, abide by and support all laws and proclamations which have been made during the existing rebellion with reference to the emancipation of slaves." (Sayles' Treat., § 846.)

And in the proclamation appointing the Hon. Andrew J.

Hamilton governor, he limits the right of suffrage to those who have taken this oath. (Paschal's Dig., p. 930, Note 1174.) And the special pardons contain this clause: "The said pardon to be void if the said A. B. shall hereafter at any time acquire any property whatever in slaves or make use of slave labor."

And in a dispatch to Governor Marvin, of Florida, the President says that no state will be considered as restored to the Union until it shall have adopted the XIIIth constitutional amendment.

The XIIIth constitutional amendment was proclaimed on 18th of December, 1865. (Paschal's Annot. Const., p. 271, Note 274; Paschal's Dig., note 120, p. 24.)

It reads thus: "Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction."

The question is as to the effect of each. Did the proclamation of President Lincoln operate, *ipso facto*, in Texas, so as to liberate the slaves *instanter*, and to deprive the masters of the ability to sell or hire them after that time, and to recover the notes given for their sale or hire?

We think not. Practically we all know that slavery *in fact* continued undisturbed until General Granger's order. Generally it ceased after that time, though there were exceptional cases until the proclamation of the constitutional amendment.

But it is insisted that although freedom did not exist *de facto*, it did become the rule *de jure*, on the 1st day of January, 1863.

Such seems not to be the understanding of the courts, whose peculiar province it is to interpret the federal constitution.

Mr. Justice SWAYNE says: "It trenches upon the power of the states and of the people of the states. It is the first

and only instance of this character in the organic law." (Paschal's Annot. Const., p. 273.)

Chief Justice CHASE says: "It establishes freedom as the constitutional right of all persons in the United States." (Id.)

Mr. Justice SWAYNE says: "What the several states under the original constitution only could have done, the nation has done by the XIIIth amendment." (Id., 276.)

And again: "The amendment reversed and annulled the original constitution, which left to each state to decide exclusively for itself whether slavery should or should not exist as a local institution, and what disabilities should attach to those of the servile race within its limits." (Paschal's Annot. Const., p. 277.)

The quotation from Chief Justice CHASE is taken from his opinion in the matter of Elizabeth in Maryland, and the quotations from Mr. Justice SWAYNE are taken from his opinion in the United States v. Rhodes, in Kentucky. It did not seem to either of these great men that slavery was abolished in any state by any thing connected with the war, but only by the XIIIth amendment or the voluntary action of the states.

Judge DUVAL, in Connett v. Williams, Austin term, 1866, held that the proclamation was a war measure; that it did not operate presently any where, but only as the arms of the United States advanced, and that notes given for negroes in Texas in 1863 could be recovered. (Paschal's Annot. Const., p. 278.)

In South Carolina it has been held that "Slaves did not become free, either *de jure* or *de facto*, by the emancipation proclamation in 1862." (Pickett v. Wilkins, 13 Rich. Eq., 336.)

And so in Arkansas. (Dorris v. Grace, 24 Ark., 326.) This was doubtless a suit for wages by a former slave. (Amer. Law Rev., vol. 2, No. 4, p. 715.)

And so it has been held in Georgia. (Cobb v. Battle, 34 Ga., 458; and see also the cases collected in Amer. Law Rev., vol. 3, No. 1, p. 134.)

We refer also to the case of Mittelhözezer v. Fullerton, 6 Adolph & Ellis, 989, quoted also in Paschal's Annotated Constitution, p. 277; and we maintain that the analogy holds good, and the whole question is, "Who shall bear the losses occasioned by a *vis major* ? And that depends upon the question, who was the proprietor when that loss was occasioned?"

We believe with Judge DUVAL, that the President's proclamations were war measures; that they were not intended to operate as law; but were in fact designed to invite the the slaves to join in the war for their freedom.

II. If we look at the subject without any reference to precedents and the *dicta* of judges, as a mere constitutional question, the position that slavery continued in Texas until the adoption of the XIIIth constitutional amendment is impregnable.

Slavery, although not mentioned in fact in the original constitution, is recognized in the "three-fifths of all other persons;" in the "migration or importation of such persons;" in the inhibition upon " capitation or other direct tax, unless in proportion to the census or enumeration hereinbefore directed to be taken," all in article I; and in the "No person held to service or labor in one state," &c., in article IV. (See the authorities collected in Paschal's Annot. Const., notes 6, 16, 17, 24, 46, 93, 169, 220.)

It had always been admitted that the rights thus guaranteed, particularly in relation to the rendition of fugitives, were in the nature of compacts, and could not be abrogated by the national government. (See the cases collected in the same work, notes 226, 227, pp. 232, 233.)

III. The extent of the power "to declare war" need not be critically considered. Whatever may be the incidental power growing out of this express grant of power

belonged to congress, and not to the President, "To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof." (See the authorities collected in Paschal's Annot. Const., note 138, pp. 138, 139.) And the same principle, more strongly expressed, is found in the 2d section of the XIIIth and the 5th section of the XIVth amendments: "Congress shall have power to enforce this article by appropriate legislation." This "appropriate legislation" has been interpreted to mean that which is "necessary and proper" legislation. (Paschal's Annot. Const., notes 274, p. 276.) The incidental power belonged to congress, and it is not to be presumed that the President intended to transcend his authority, which made him commander-in-chief of the army and navy under the law, and act absolutely according to his own will.

IV. We do not see the application of the principle that a contract founded on illegal dealing or a consideration of turpitude is void. If the negroes remained slaves, that principle had no application. But even in the application of this principle there must be great discrimination. A contract is not void because it tends to promote illegal or immoral purposes. (Hillard on Sales, 376; Armstrong v. Toler, 11 Wheat., 258; Story's Conflict of Laws, 6th ed., §§ 257, 258; Armfield v. Tate, 7 Ired., 259.)

Nor is a sale of goods void although the seller knows that they are bought for illegal purposes, unless he has a part in the illegal purpose. (Hodgson v. Temple, 5 Taunt., 181; Dater v. Earl, 3 Gray, 482; Coolige v. Inglee, 13 Mass., 26; Phillips v. Hooker, 1 N. C. Eq., 205.)

Nor will the mere fact that the negroes were not slaves when sold render the note void. To support this, read Randon v. Toby, 11 How., 493, which was a Texas case. We may admit the maxim, that *ex dolo malo non oritur actio*. It is

upon this maxim that all the courts, except perhaps North
Carolina, have held, that contracts founded upon Confeder-
ate treasury notes were void, because they were issued to
aid the rebellion—looked expressly to dissolving the Union;
and, therefore, their vicious character adhered to every con-
tract which it touched, not because of the illegal dealing of
the parties, but because the thing dealt in could not be per-
mitted to have any value.   (Pelty v. Long, 40 Mo., 536;
Schmidt v. Barker, 17 La. Ann., 264; Stillman v. Looney,
3 Cold., 20; Thornburg v. Harris, Id., 157; Gill v. Creed,
Id., 205; Shiner v. Green, Id., 419; Potts v. Gray, Id., 468;
Henry v. Franklin, Id., 472; Linder v. Barbee and Smith
v. Smith, at the last term here, [30 Tex., 754;] and Mc-
Gehee v. Goodman at this term, [31 Tex., 252].)

MORRILL, C. J.—In a country, nation, or state, where
"what pleases the prince is law," it is only necessary to
know the actions or even the wishes or whims of the prince
to adjudicate upon the rights of person and property.   In
a state or nation where, in times of war, what pleases the
commander-in-chief of the victorious party is law to the
conquered, a proclamation of the commander, setting forth
his will, would be decisive of the status of the conquered.
There are but few nations, even among the civilized of
modern times, who in times of peace are governed by a
"rule of action prescribed by the supreme power in a state;"
and still less is this number in times of war.   Even in that
nation which we denominate our parent country, and which
is, *par excellence*, a country of laws in peace, the happiness
or misery of the conquered in times of war depends in a
great degree upon the wishes, will, whim, or caprice of
the victorious commander.   Whether the conquered shall
retain their lives, liberty, or property, or whether their
property shall be confiscated and they themselves blown
from the cannon's mouth, depends in a great measure
upon the humanity, avarice, or bloodthirstiness of the gen-

eral in command. The history of the world is a detail of wars, "and woe to the conquered" blackens every page. But there is a nation whose theory of government is based upon law, both in peace and war; where the organic law provides that "no person shall be deprived of property without due course of law;" and where in times of war not the commander-in-chief of the army and navy, but the "congress shall have power to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water," "to raise and support armies," "to make rules for the government and regulation of the land and naval forces."

We are so accustomed to look at the precedents furnished us by those nations who either have no constitutions, or whose organic laws do not contain provisions similar to those of the constitution of the United States, that we base our actions and principles and thoughtless declarations more upon those precedents than our own laws.

In England the king is the sovereign power, and as such sovereign has the power to declare war and exercise such other rights of sovereignty as are specially delegated to the congress. In the United States the congress is vested with the sovereign power.

It is evident that if, during the rebellion, the citizens of Texas were citizens of and subject to the constitution of the United States, then they could not "be deprived of property," in slaves, money, stocks, or agricultural products, without due course of law. If they were a part of another state or *de facto* government, and they and their property were captured by the forces of the United States, in that case not the commander-in-chief of the army and navy of the United States, but congress, and congress alone, had and has "power to make rules concerning those captures." In either case the proclamations, military orders, or whatever else they may be called, can have no effect or force upon any other than the men subject to the

commander, unless they are based upon an act of congress. The powers of the government of the United States are separate and distinct. The powers which belong to one department are exercised by the officers belonging to that department, and exercised independently of any of the others. Each department is separate, co-ordinate, and equal. No majesty is recognized but the majesty of the law; and no man can exercise any power but such as has been delegated to him merely as the servant of the people.

"The power existing in every body politic is an absolute despotism. In constituting a government it distributes that power as it pleases, and in the quantity it pleases, and imposes what checks it pleases upon its public functionaries." (Livingston v. Moore, 7 Pet., 546.)

In the case of Brown v. United States, 8 Cranch, 110, the question before the court was, whether certain property, then in the United States, but belonging to a British subject, with whose nation the United States were at war, was subject to confiscation, Chief Justice MARSHALL, in delivering the opinion of the court, said:

"The questions to be decided by the court are:

"1st. May enemy's property, found on land at the commencement of hostilities, be seized and condemned as a necessary consequence of the declaration of war?

"2d. Is there any legislative act which authorizes such seizure and condemnation?

"Since, in this country, from the structure of our government, proceedings to condemn the property of an enemy found within our territory at the declaration of war can be sustained only upon the principle that they are instituted in execution of some existing law, we are led to ask, is there such a law?"

The chief justice, after having shown that the declaration of war was not such a law, proceeds:

"There being no other act of Congress which bears upon

the subject, it is considered as proved that the legislature has not confiscated enemy's property which was within the United States at the declaration of war, and that the sentence of condemnation cannot be sustained.

" One view, however, has been taken of this subject which deserves to be further considered:

"It is urged that, in executing the laws of war, the executive may seize and the courts condemn all property which, according to the modern law of nations, is subject to confiscation, although it might require an act of the legislature to justify the condemnation of that property which, according to modern usage, ought not to be confiscated."

"The argument must assume for its basis the position that modern usage constitutes a rule which acts directly upon the thing itself by its own force, and not through the sovereign power.   This position is not allowed.

It is not an immutable rule of law, but depends on political considerations, which may continually vary. It is proper for the consideration of the legislature, not of the executive or judiciary."

Judge STORY, in his Commentaries on the Constitution, § 1197, after citing the power of Congress "to make rules for the government and regulation of 'the land and naval forces,'" proceeds: "This is a natural incident to the preceding powers to make war, to raise armies, and to provide and maintain a navy.

"In Great Britain the king, in his capacity of generalissimo of the whole kingdom, has the sole power of regulating fleets and armies.   The whole power is far more safe in the hands of congress than of the executive, since, otherwise, the most summary and severe punishments might be inflicted at the mere will of the executive."

In § 1177, in commenting upon the power of congress "to declare war," &c., this same author says: "The power to declare war is exclusive in congress.   It includes the ex-

ercise of all the ordinary rights of belligerents; and congress may, therefore, pass suitable laws to embrace them. They may authorize the seizure and condemnation of the property of the enemy, within or without the territory of the United States, and the confiscation of debts due to the enemy. But until laws have been passed upon these subjects, no private citizen can enforce any such rights, and the judiciary is incapable of giving them any legitimate operation."

This same author, in commenting on the powers of the executive, in § 1512, says: "In England the power to make treaties is exclusively vested in the crown." But however proper it may be in a monarchy, there is no American statesman but must feel that such a prerogative in an American president would be inexpedient and dangerous. It would be inconsistent with that wholesome jealousy which all republics ought to cherish of all depositaries of power.

§ 1515: "A man raised from a private station to the rank of chief magistrate, for a short period, having but a slender or moderate fortune, and no very deep stake in the society, might sometimes be under temptations to sacrifice duty to interest, which it would require great virtue to withstand. If ambitious, he might be tempted to risk his own aggrandizement. If avaricious, he might make his treachery to his constituents a vendible article at an enormous price.

"Although such occurrences are not ordinarily to be expected, yet the history of human conduct does not warrant that exalted opinion of human nature, which would make it wise in a nation to commit its most delicate interests and momentous concerns to the unrestrained disposal of a single magistrate. It is far more wise to interpose checks upon the actual exercise of the power, than remedies to redress or punish an abuse of it."

But the congress of the United States have declared their will as to the disposition of slaves. As early as the 6th of

August, 1861, and the 17th day of July, 1862, the congress of the United States passed "An act to confiscate property used for insurrectionary purposes," and "An act entitled an act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes." (11 Stats., 589.)

The 9th section of this last act provided, "that all slaves of persons who shall hereafter be engaged in rebellion against the government of the United States, &c., escaping from such persons and taking refuge within the lines of the army, and all slaves captured from such persons, or deserted by them and coming under the control of the government of the United States, shall be deemed captives of war, and shall be forever free of their servitude and not again held as slaves."

This, as well as all the other sections of the act, was prospective, and the fourteen different sections of the act contained full and ample "rules concerning captures on land and water."

The congress by this act virtually negatives the power of any other branch of the government to do what the constitution authorizes that body alone to do. The act specially declares the slaves captives of war, and bases their freedom on the fact that their owners "were engaged in rebellion against the government of the United States," and it does not free any others.

This same act, in the 7th and 8th sections, contemplated "due course of law" against the owners of the property, and of course the freedom of the slave was dependent upon the disloyalty of the owner, as found by the court.

If, as contended, the proclamation of the President, *ipso facto*, made all slaves free, it would be in utter disregard of the acts of congress, thus pointing out the manner and conditions of their freedom, and virtually nullify them. And if the judiciary prove subservient to the executive, our boasted

republican government is really, *quoad hoc*, an absolute monarchy in times of war.

As the proposed XIIIth amendment to the constitution was passed by congress on the 1st day of February, 1865, and as it is to be presumed that the congress supposed that the requisite number of states would ratify it, which was really done previous to the 18th December, 1865, hence there was no necessity to convict their owners of treason to free the slaves. By this amendment, not only the slaves of the disloyal, but of the loyal also, were free, and on the 18th of December, 1865, slavery ceased to exist, and freedom was established co-extensive with the United States.

It is insisted that the proclamation of the President, wherein, as a war measure, he declared the slaves in Texas free from and after the 1st of January, 1863, even if it did not actually make them free, at least it showed the policy of the United States, and that a court, bound to observe the constitution and laws of the United States, ought not to give its aid to enforce a contract for a sale of a slave after that time, and previous to their actual emancipation, because the contract was contrary to the policy of the United States. That the emancipation proclamation was issued as a war measure appears on its face; that it proved to be one of the greatest of war measures is universally admitted. But its effects were not upon the parties apparently most interested only. That it was designed to counteract the efforts made by the Confederates in their attempts to enlist the sympathies and material aid in the western European nations, then and there equally balanced, or perhaps slightly preponderating to the cause of the rebels, and that it faithfully performed its mission, will be shown by the historian. During the first years of the war, the acts of congress and the military orders of the President, as commander-in-chief of the army and navy, amply attest that the policy of the United States was the integrity of the Union, without any

change of the peculiar southern institution. As late as the 11th of February, 1861, the House of Representatives in congress passed a resolution, yeas 161, nays none, "that neither congress nor the people or government of the non-slaveholding states have a constitutional right to legislate upon or interfere with slavery in any slaveholding state of the Union." The President, in all messages and orders, inculcated the same ideas. But, after the war had progressed so far as to be evident that a complete subjugation of the rebellious states was the only preliminary to the integrity of the nation, the policy of the President was changed. As the Confederates disclaimed the protection guaranteed by the constitution and laws of the United States, the President took them at their word. Cutting himself loose from the constitution and laws, and appealing to and invoking the considerate judgment of mankind and the gracious favor of Almighty God, he launched out in the open sea of war, and, as a fit and necessary war measure for suppressing the rebellion, declared that all the slaves in a certain designated portion of the United States are, and henceforward shall be, free; and that the executive government of the United States, including the military and naval authorities therof, will recognize and maintain the freedom of said persons. Two of the first-class nations of Europe had long before abolished slavery in their territories and dependencies, and the autocrat of the Russias had recently followed their example, and not only was the considerate judgment of the people of the western hemisphere, but of all mankind, invoked on this measure.

These nations were estopped by their own actions from giving further countenance and encouragement to the Confederate States in their attempt to erect a government whose corner-stone was slavery. It is to be remarked that the President did not base this proclamation upon the constitution or laws of the United States, but solely on his power as commander-in-chief of the army and navy.

He did not intimate that any other power of the government would assist him, but simply that the executive government of the United States, including the military or naval authorities thereof, would recognize and maintain the freedom of said power.

Congress took a different course, and acted agreeably to their often-repeated declaration, that universal emancipation could not legally take place except by an amendment to all the state constitutions or of the national constitution, which the people, through the States, adopted. Until slavery was abolished no feature of it was destroyed. Owners of slaves had all the rights of property therein, and the one not the least in importance is its vendible quality.

The known and indisputable effects of the President's proclamation are sufficient to pronounce it unparalleled as a war measure and military strategy. The announcement to the slaves that they were free caused them to desert their masters by thousands, and, by thus depriving the confederacy of their assistance, and transferring it to the army of the United States, doubly assisted the latter, and in the same ratio injured the former. The invocations of the considerate judgment of mankind and the gracious favor of Almighty God were responded to by the passage of the XIIIth amendment to the constitution, and had the same potency and effect on the ruling powers of Europe that the command of an ancient Jewish hero had on the sun and moon when he ordered them to "stand still."

We now pass to another and different subject, having reference to the effect of the freedom of slaves upon contracts executory in part for their sale. In the case before the court the vendor, in January, 1865, sold and delivered a slave to the vendee, who in consideration thereof executed a promissory note for the payment.

In the other case, a slave, at the same time, was hired for a year, and a promissory note given in consideration of the hire.

As there was nothing illegal in the transaction, the notes were not void for illegality. The consideration is represented as having failed. It is not pretended that at the time of the contract there was no consideration. Each party had the same means of knowing the future condition of the slave, and acted upon his own ideas as to the result of the war. That the cause which proved mortal to slavery would soon sweep over the land was apparent to some, and disbelieved by others. There was, however, no breach in the contract on the part of the vendor at the time of the sale. And though the vendor guaranteed the subject of sale, a slave for life, and the slave in the same year was made free by the superior power, inasmuch as at the time the sale was made he was a slave for life, yet, if his freedom was occasioned afterwards, not by the vendor, but by the sovereign power of the nation, the vendor did not violate his contract.

The question is, Who was the owner at the time the slave became free? "*Res perit suo domino.*"

The vendor could not legally guaranty that the supreme power in the state or nation would not exercise their legitimate functions. All governments are based upon the theory that the sovereign power therein is omnipotent in what respects property.

In Graves v. Heaton, 3 Cold., 13, the supreme court of Tennessee said:

"The pecuniary loss consequent upon the emancipation of slaves by the amendment of the constitution of the state adopted on the 22d of February, 1865, must be borne by those who were the owners of such slaves at the time of their emancipation."

In Woodfin v. Sluder, 1 Phill., 202, the court said:

"If A give a slave to B for a year, B, during the year, is the owner of the slave. If the slave die during the year, A loses his general property, and B loses the special property and the hire. The emancipation of slaves during the

year was then artificial death on slaves, and operated as would their natural death; therefore the defendant is liable for the hire during the whole of the year."

After the parliament of Great Britain passed the act (3 and 4 W., c. 4, 73) entitled "An act for the abolition of slavery throughout the British colonies, for promoting the industry of the manumitted slaves," &c., the purport of which act was, that slaves in the colonies should be free from slavery, but should be apprenticed until the 1st August, 1840, and afterwards entirely free, one M, being the owner of one hundred and fifty-three former slaves, then apprentices, conveyed them to F, in consideration of £7,800, to be paid in six annual installments, on the 12th day of January each successive year. In July, 1868, the governor of the island wherein the parties resided decreed, that from and after the 1st of August, 1838, all and every of the former, held as apprentices, should be free from their apprenticeship, thereby lessening the term two years. On the refusal of F to pay the two last annual installments, falling due after the apprentices became free, M brought suit on the contract, and F set up the defense as above stated in all its changes and varieties.

In delivering the opinion of the court, the judges said :

"The whole question is, who shall bear the loss occasioned by a *vis major*. And that depends on the question who was the proprietor when that loss was occasioned. The property in the service of these laborers had been transferred to the defendant. The question is analogous to those which arise by fire, as, whether the goods destroyed were *in transitu* or the transit was ended. If the property here had passed and the residue of it was destroyed by a *vis major*, the loss must fall upon the proprietor of the thing, namely, of the services during the unexpired term. And in my opinion that was the case." (51 Eng. Com. Law, 1019.)

"This was a contract of sale, an engagement on one side

to transfer all right to the services, and on the other to pay the stipulated sum.   The act of the colonial legislature in 1838 made no alteration in that contract."

This case is decisive of the two principal points arising in the case before the court.

It certainly will not be contended that the policy of the British government, at the time the contract for the sale of the apprentices was made, had not become as notoriously opposed to slavery as that of the United States during the war.   Yet the British courts did not conceive that the sale of these former slaves, under the name of apprentices, was contrary to public policy, or that the contract was illegal or void for want of consideration.

LINDSAY, J.—I concur with the chief justice in the conclusions at which he has arrived in the opinion delivered by him in these cases.   I am satisfied with the justice of the decision upon the principles of law by which we as a court are to be governed.   The facts are few and simple, and involve only this inquiry:   Can an action be sustained in the courts of this state for the contract price of the purchase or hire of slaves made since the 1st day of January, 1863, the date of the proclamation of emancipation by the President of the United States, and prior to the surrender of the rebel army within its limits?   As an expounder of the law then in force, as the rule of conduct in the local jurisdiction, I feel no hesitancy in pronouncing my opinion that such action may be rightfully sustained.

After the very elaborate opinions which have been given by my brethren on each side of this question, in which the methods of elucidation of every legal proposition directly or incidentally connected with it have been exhausted, I desire to do no more than briefly to give the reasons of my concurrence in the conclusions to which a majority of the court has arrived.

Slaves were property, a chattel interest established by
xxxi—34

the constitution and local municipal laws of the State of Texas, recognized by the constitution and laws of the United States, as a part of the civil polity of the State, with which the national authority had no right to interfere in the ordinary civil action of the government. In times of peace, the faith of the national government was plighted to leave slavery undisturbed in its local limits. There it might have continued to exist for generations yet to come, but for the civil convulsion brought on by the rebellion. There it did exist, in my judgment, both in fact and in law, until by the actual force of the national arms its disruption and overthrow, as a legal institution, was made a reality. It was a legal institution within the local limits of the State, and the persons constituting it were the subjects of traffic, as any other chattel interests, up to the very moment of its final overthrow by force. By force it was established; by force it was destroyed.

While this is my conviction as to the legal incidents of the proposition, I question not the right, nor the justice, nor the wisdom of congress in authorizing, and of the President in proclaiming, the freedom of the slaves in the insurrectionary states, as a war measure. The institution was abolished by war in the insurgent states. That abolition did not take place simultaneously in all the insurrectionary states and parts of states. In the midst of a civil war the political power of the federal government authorized the President, as commander-in-chief of the army and navy of the nation, to issue such proclamations as the exigencies of the war might render necessary. In subordination to the national will, thus expressed, the President, as such commander, did issue a preliminary and a final proclamation upon the subject of emancipation; the first, the loud tocsin tolling the last alarm; the second, announcing the future status of the slaves then in their possession, and under national control, and within the military lines, according to the laws of war, and heralding the approaching

jubilee to the other captives of centuries who were still in the fetters of bondage within the territorial limits of the insurgent states. The legal effect of that final proclamation was, *eo instanti*, to liberate all slaves then in the possession and under the absolute control of the national forces, and it gave a solemn pledge of the nation to liberate the residue. Those already in the possession or under the absolute control of the nation were captured movable property of the enemy, made in war, and was lawful prize, according to the principles of international law, and the conquering belligerent had the right to appropriate the proceeds of the alienation of such property by sale, or to deal with it in such manner as in its wisdom it might deem most expedient, most politic, or most humane. In the exercise of that right and of that discretion the nation obeyed the christian injunction, "Let the bondman go free." This action of the nation fixed the status of those slaves then in possession or under its actual control irreversibly, because the nation, as a belligerent, had the right to do as it pleased with its captures in war.

This, however, could not be the legal effect of the proclamation in reference to those slaves in the insurrectionary districts and states which the finally-successful belligerent had not yet subjugated and reduced into possession and to submission. The proclamation could not *proprio vigore* liberate the slaves. Something else was needed for its consummation; that something, the further exertion of the national power, was supplied, and the deed was done upon the submission or surrender of the organized forces of the state to the national authority and the enunciation of the fact by its duly-accredited agents. That period I regard as the epoch of emancipation in Texas, both actual and legal, and it will ever be hallowed in the memories of that enfranchised race within the borders of the state as the true era of their liberty, and, in obeying their own natural

impulses, they will ever cherish it as the anniversary of the birth of their freedom.

After the proclamation the slaves who were in the federal lines at its emanation, and those who escaped from their masters and got within those lines aferwards, were *ipso facto* free, because as mere chattels they thereby became captures in war. As soon as they came under the control of the national forces they as persons became absolutely freemen, because such was the declared will of that belligerent power, as expressed in the proclamation issued by the commander-in-chief of the army by the authorization of congress, the law-giving power of the nation. The liberation went on *pari passu* with the progress of the subjugation of the revolted states, until it reached its finality by the submission of the rebel forces and the people of the State of Texas, and the enunciation of that submission by the military officer of the conquering power, when the legal existence of slavery ceased in Texas. Until then traffic in slaves was lawful in the local government. The owners and possessors of slaves were divested of all property in them by a *vis major*, the success of the opposing belligerent, whose declared will was their freedom, to be practically enforced. The actual owners of the property, at the time of the practical application of this *vis major*, whereby the right was destroyed, are constrained by the rules of law to sustain the loss, and rightfully so.

I do not concede that the amendment to the constitution of the United States, known as the XIIIth article of that instrument, was necessary to the consummation of the freedom of the slaves in the insurrectionary states and districts. All that was necessary to the full accomplishment of that object was a complete and thorough subjugation of the revolted states and districts, and a formal annunciation to the rebellious citizens that the purpose was achieved. Upon submission this settled and fixed forever, in contem-

plation of law, the future condition and legal attributes of that species of property, and rendered all traffic and negotiation about it thereafter null and void, and in conflict with the paramount authority of the national government. Until this achievement of success by the national forces the policy of the national government was not and could not be established and fixed and become a rule of law for the government of the citizens in the revolted states. The direct and specific object and purpose of the XIIIth article of the constitution of the United States was to exterminate every vestige of slavery within the territorial limits of the nation. It did not and could not affect the question in the insurgent states, where abolition was already an accomplished fact, except as being declaratory of the national will, and as affecting the status of such persons as had been slaves, whose rights might be drawn in question incidentally in the courts of the several states. Its immediate object was to emancipate, in the states not in rebellion, where slavery existed, and which consequently was unaffected by the war policy of the government. It was therefore necessary to put them in subordination to the future civil policy of the national government.

My opinion then is, that slavery was not abolished on the 1st day of January, 1863, the date of the final proclamation of the President of the United States, nor yet did it exist in Texas at the date of the adoption of the XIIIth article of the constitution of the United States; but upon the success of the national forces, in subduing the opposition of those here engaged in the rebellion, and its announcement to this people and the world that the purposes of the struggle, according to the war policy which had been proclaimed, was fully achieved, the legal manacles which held that race in bondage in this state were then dissolved, and they stood for the first time disenthralled and completely purged and purified of the factitious character of chattels which force, fraud, and violence had en-

tailed upon them. The announcement of the results of the war, and of the accomplishment of its purposes in the State of Texas, was made by the military power, which conducted the armies and commanded those results, to the people of this state, on the 19th day of June, 1865. This, in my judgment, is the actual, the natural, and the legal epoch of emancipation in the State of Texas. Assuming it, it harmoniously chimes in with the coveted peace and repose of society, and obviates the origination of innumerable controversies which would only serve to perplex and harass the community still further with a much-vexed question, and which has already proved so disastrous to thousands.

The notes sued upon in these cases having been executed upon contracts made for the purchase and hire of slaves since the 1st day of January, 1863, and prior to the 19th day of June, 1865, I am clearly of opinion that the actions were maintainable, and should be so ruled by the court. The loss of the property in the slave by the actual owner in the one case, and the loss of the unexpired time of the bailment for hire in the other, the condition of the parties at the time of the destruction of the right by a *vis major*, must be sustained by such owner and bailee respectively.

LATIMER, J., concurred with Chief Justice MORRILL and Justice LINDSAY.

HAMILTON, J., with CALDWELL, J., dissenting.—In this and several other cases of the same character the question is, whether obligations for money, given for the purchase of colored persons as slaves in Texas, since the 1st of January, 1863, can now be enforced in the courts of the country?

The importance of the question is at once perceived, and this court, being anxious to arrive at a conclusion resting upon reason and authority, some weeks past invited discus-

sion of the point by the bar generally. It is to be regretted that this invitation was responded to by but two attorneys of the court, and that they both appeared on the affirmative side of the question, as stated above. Their arguments were certainly very able and exhaustive on that side, as was to be expected of them from their high and well-earned reputations at the bar; but I am constrained to differ not only with them, but also with some of my brethren of this court, as to much of the reasoning employed, and certainly as to the conclusion at which they have arrived. One of the able counsel alluded to says, in the first paragraph of his printed brief:

"We are invited to discuss the very question, What was the effect of President Lincoln's proclamation of the 1st day of January, 1863, upon negro slavery in Texas."

This, to my mind, is not only not a fair and full statement of the real point involved, but does not in fact reach the proper inquiry. The manner in which the question is stated by him shows that he regards it as one to be settled by the legal effect to be given to the President's proclamation by the mere effect of his promulgation. It will, however, be more fair to give the questions, as stated more at length by him in his brief and as he has argued them. He asks, "Did the proclamation of President Lincoln operate, *ipso facto*, in Texas so as to liberate the slaves instanter, and to deprive the master of the ability to sell or hire them thereafter, and to recover the notes given for their sale or hire?" And, after having answered this, he proceeds to state another proposition, in the following form, the truth of which he denies: "But it is insisted that, although freedom did not exist, *de facto*, it did become the rule, *de jure*, on the 1st day of January, 1863;" and then adds: "Such seems not to be the understanding of the courts, whose peculiar province it is to interpret the federal constitution." He refers to a decision by Chief Justice CHASE in a case in Maryland, and one by Mr. Justice SWAYNE in Kentucky, neither of which, as I

shall presently show, have the slightest applicability to the case at bar, and deduces from them, very unwarrantably, as must be manifest from a moment's reflection, authority for saying that slavery only ceased to exist in Texas by the ratification of the XIIIth amendment of the constitution of the United States.

And these propositions I understand to be substantially those upon which the members of the court from whom I differ rest their opinion.

The first and second of these points are delusive, and, whether so intended or not, are well calculated to lead the mind from the true inquiry upon which this case rests.

And, for the purpose of making myself understood at once in my effort to expose their fallaciousness as predicates from which to reason in this case, I will state what I regard as the real question in the case, to wit: "Was a sale of negroes in Texas after the 1st of January, 1863, opposed to the solemnly-declared will and policy of the United States government, and had the United States the right, under existing circumstances, to declare such policy?" If these questions are to be answered in the affirmative, then it is unnecessary to do more than add, that they should receive no aid from loyal courts to carry them into execution.

Now, from these real questions I do not purpose to be diverted by reference to authorities which I do not controvert, which I freely admit to be sound law, but which to my mind cannot by the most adroit reasoning be made applicable to this and other cases of the same character.

Why ask the question whether the proclamation of the President operated, *ipso facto*, so as to liberate the slaves in Texas instanter, or whether, if they were not free under it *de facto*, it was not the rule *de jure?* Their actual condition up to the close of the war was, *de facto*, that of slaves undoubtedly, and their condition *de jure* to-day in Texas depended upon the results of the war; for if the confederacy had succeeded the courts of this State would have dis-

regarded not only the proclamation of emancipation, but the XIIIth amendment of the constitution as well, and this court would not be sitting here to determine this or any other question. Whatever rights they were to enjoy under and by virtue of this proclamation were to be secured by war then existing. If the government of the United States failed in the contest, the proclamation was nugatory; if it succeeded, then freedom was established. I do not, therefore, throw myself upon doubtful or untenable ground by assuming that emancipation was an accomplished fact by mere force of the proclamation.

But I do assume that, by the terms of that memorable instrument, the high purpose of the government was, in solemn form, made known to the citizens of the government and to the nations of the earth, that slavery should cease in the states which it embraced, provided effect could be given to it by force of arms, and that this declaration of purpose was authoritative and warranted by the constitution as a measure of war, and was carried into full effect by the success of the national arms.

Now, for the purpose of maintaining these positions, I shall admit, as freely as others earnestly insist, on the fact of Texas being a *de facto* state government during the war. In truth, I have never been able to perceive any reason, legal or political, why any friend of the government should deny a fact which all the world knows to be true.

From the fact of a civil war and a *de facto* government here in Texas I deduce the right of the national government to declare and effect the emancipation of the slaves.

The character of the war through which we have lately passed and the status of the governments engaged in the rebellion, state and Confederate, must be determined, in order to arrive at a proper solution of the real question involved in this case.

I proceed to consider these questions at some length, because of their intrinsic importance as involving grave

and interesting principles of the public law of nations, the rights and powers of the national government as a successful belligerent in the late war, and because it is believed that very many claims, contracts, and obligations, in this state, are dependent upon the principles which are here to be determined.

The question at bar is dependent upon the effect to be given to the action of the United States government pending and since the war, as the successful contestant in the late conflict of arms. It becomes, therefore, necessary to inquire somewhat into the nature and character of the contest and the resulting rights and obligations of the respective contestants. This I proceed to do as briefly as may be, to make my views of them intelligible. To this end it is needless to recur to the past, beyond the necessity and duty of affirming the paramount authority of the national government over all the citizens within its jurisdiction prior to and at the moment of the inception of the war. That the war occurred, and when and in what manner, by whom and for what assumed cause and declared purpose, are matters of public history. Our inquiry relates to its effects through the action of the national government upon the institution and rights of the people of the insurgent states.

War is defined briefly by some writers on international law to be "That state in which we prosecute our right by force." I deem it essential to the proper understanding of the question before us to determine the character of the recent war. Was it a mere association of insurgent citizens, resisting the authority of government, and who by their acts made themselves, and themselves only, personally responsible to the government, or did it assume other and larger proportions? One of the highest authorities upon international law, in treating upon this question of what distinguishes mere rebellion from civil war, says: "When a party is formed in a state, who no longer obey the sovereign, and

is possessed of sufficient strength to oppose him, or when, in a republic, the nation is divided into two opposite factions and both sides take up arms, this is called civil war. Some writers confine this term to a just insurrection of the subjects against their sovereign, to distinguish that lawful resistance from rebellion, which is an open and unjust resistance. But what appellation will they give to a war which arises in a republic torn by two factions, or in a monarchy between two competitors for the crown? Custom appropriates the term of "civil war" to every war between members of one and the same political society.

"A civil war breaks the bands of society and government, or at least suspends their force and effect; it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge. Those two parties, therefore, must necessarily be considered as thenceforward constituting, at least for a time, two separate bodies, two distinct societies. Though one of the parties may have been to blame in breaking the unity of the state and resisting the lawful authority, they are not the less divided in fact. Besides, who shall judge them? Who shall pronounce on which side the right or the wrong lies? On earth they have no common superior. They stand, therefore, precisely in the same predicament as two nations who engage in a contest, and, being unable to come to an agreement, have recourse to arms.

" This being the case, it is very evident that the common laws of war—those maxims of humanity, moderation, and honor, which we have already detailed in the course of this work—ought to be observed by both parties in every civil war. For the same reason which renders the observance of those maxims a matter of obligation between state and state, it becomes equally and even more necessary in the unhappy circumstance of two incensed parties lacerating their common country. Should the sovereign conceive he has the right to hang up his prisoners as rebels, the oppo-

site party will make reprisals; if he does not religiously observe the capitulations and all other conventions made with his enemies, they will no longer rely on his word. Should he burn and ravage, they will follow his example; the war will become cruel, horrible, and every day more destructive to the nation." (Vattel's Law of Nations, 424.)

The reasoning of this profound writer on international law, if it had ever been doubted, would be fully vindicated in the history of this country in the last seven years.

There was a hostile array of two sections of the country of such magnitude as not only to demand the observance of the rules of civilized warfare, but a full compliance with the authority quoted, in each granting to the other all the rights of belligerent powers.

To the same effect are the decisions of the supreme court of the United States. In the Prize Cases, as they are called, decided early in the war, (1862,) the public law of nations was, in the opinion of a majority of the court, applicable to the then existing condition between the two sections of the country, and was so even before a formal declaration of war by congress.

In these cases the point of difference between the learned judges, the majority and the minority of the court, at the important point, was as to the legality of all war measures by the President before a formal declaration of hostility between the United States government and the revolted states had been made by congress. The majority of the court was of opinion that "a civil war is never proclaimed *eo nomine* against insurgents," and that "by the constitution, congress alone has the power to declare a national or foreign war," and therefore sustained the President in his proclamation of the blockade of the ports of the southern states, under which the seizures had been made, prior to the declaration of war by congress; and the minority of the court insisting that congress could alone authorize an

act of war, just as I understand the constitutional objection in this case, on the part of my brethren of the bench who differ from me, to the power of the President to declare the emancipation of the slaves of the revolting states as a measure of war.

In one of these cases the claimant was a citizen of England, and it was urged in behalf of his claim, that without a formal declaration of war by congress the President had no authority to issue a proclamation blockading the southern ports, and that in fact he had no legal notice of the war or the blockade, and was not, therefore, by the public law of nations, responsible for disregarding the proclamation.

Mr. Justice GRIER, who delivered the opinion of the court, said upon this point: "As soon as the news of the attack upon Fort Sumter, and the organization of a government by the seceding states assuming to act as belligerents, could become known in Europe, to wit, on the 13th of May, 1861, the queen of England issued her proclamation of neutrality, recognizing hostilities as existing between the government of the United States of America and certain states styling themselves the Confederate States of America.

"After such an official recognition by the sovereign a citizen of a foreign power is estopped to deny the existence of a war, with all its consequences as regards neutrals. They cannot ask a court to affect a technical ignorance of the existence of a war which all the world acknowledges to be the greatest civil war known in the history of the human race, and thus cripple the arm of the government, and paralyze its power by subtle definitions and ingenious sophisms!" (2 Black, 669.)

It was contended in these cases (Prize Cases) by counsel for some of the claimants, who were citizens of the insurgent states, that this property was not liable to seizure, because they were not technically "public enemies," even though they might be rebels and traitors to the govern-

ment; that insurrection is the act of individuals, and not of a government or sovereignty; that the individuals engaged are subjects of law; that confiscation of their property can be effected only under municipal law; that by the law of the land such confiscation cannot take place without the conviction of the owner of some offense; and, finally, that the secession ordinances were nullities, and ineffectual to release any citizen from his allegiance to the national government, and consequently that the constitution and laws of the United States were still operative over persons in all the states for punishment as well as protection.

To all this the court replied as follows: "This argument rests on the assumption of two propositions, each of which is without foundation on the established law of nations. It assumes that where a civil war exists, the party belligerent, claiming to be sovereign, cannot, for some unknown reason, exercise the rights of belligerents, although the revolutionary party may. Being sovereign, he can exercise only sovereign rights over the other party.

"The insurgent may be killed on the battle-field or by the executioner; his property or land may be confiscated by municipal law; but the commerce on the ocean, which supplies the rebels with means to support the war, cannot be made the subject of capture under the laws of war, because it is 'unconstitutional'—[the very argument used by my brethren from whom I dissent in this case.] Under the very peculiar constitution of this government, although the citizens owe supreme allegiance to the federal government, they owe also a qualified allegiance to the state in which they are domiciled. Their persons and property are subject to its laws.

"Hence, in organizing this rebellion, they have acted as states, claiming to be sovereign over all persons within their respective limits, and asserting a right to absolve their citizens from their allegiance to the federal government.

Several of these states have combined to form a new confederacy, claiming to be acknowledged by the world as a sovereign state. Their right to do so is now being decided by wager of battle. The ports and territory of each of these states are held in hostility to the general government. It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force. South of this is enemy's territory, because it is claimed and held in possession by an organized hostile and belligerent power." (2 Black, 673.)

From these authorities, which I have so freely quoted, and from my knowledge of the character, magnitude, and duration of the war, the manner in which it was conducted by the parties engaged in the contest, with all the prominent incidents connected with it to its close, of which, as a matter of public history, I must take judicial knowledge, I am at no trouble to determine that it was a "civil war" of vast proportions, in which the contesting parties respectively were entitled to and were accorded all the rights of belligerents, according to the established public law of nations. And, as resulting from this necessarily, that the successful belligerent may rightfully claim and exercise all the powers accorded to a conqueror under the laws of war. That less is claimed is an act of magnanimity on the part of the conqueror, which should elicit gratitude rather than abuse. What is claimed, however, must be respected.

To the same effect are the cases of Mrs. Alexander, in 2 Wallace, and the still later case of Mauran v. Insurance Company, in 6 Wall., 13. In this last case, Mr. Justice NELSON, who delivered the opinion of the court, remarked, in speaking of the rebellion and character of the war: "A government in fact was erected, complete in the organization of all its parts, with sufficient resources of men and money to carry on a civil war of unexampled dimensions.

*   *   The so-called Confederate States were in the possession of many of the highest attributes of government."

Thus, in few words, the supreme court of the United States have settled the question of civil war and *de facto* government, about which a great deal has heretofore been very foolishly said.

There seems to be a great deal of misapprehension in the minds of many persons as to the legal or political effect of admitting that the insurgent states did in fact for a time secede or withdraw from the Union. I am not of those who believed in the doctrine of legal secession, or that it could rightfully occur, except in case of wrongs, oppression, and tyranny, such as would confer upon the injured the sacred right of revolution, defensible upon the moral ground of duty and self-preservation, nor do I believe there was justification, cause, or excuse for the rebellion.

But the question is as to a fact, not as to the law which justified or condemned it. If men and nations could do nothing contrary to law, how happy, comparatively, would be the condition of society.

The revolting states did practically, not legally, withdraw from the Union, by severing their political connection with it; they did expel from their limits the flag of the United States, its courts and officers, civil and military, and erected a new government in its stead, with a constitution, a president, a congress, a judiciary, and officers, state and confederate; organized vast armies, equipped and put them in the field; and for four years contested the palm of final victory with the United States on more than three hundred bloody fields, in a war which is admitted to have been the most gigantic of modern times. It is too late for those who were engaged on the confederate side to insist now that they have always been in the Union, and that, therefore, the condition of the revolting states has not been changed. There are many citizens of this state who, adhering to the United States, found it necessary at

an early period of the war to seek the protection of its flag, who could testify that they performed weary pilgrimages of hundreds of miles, by land and water, before their hearts were gladdened by its sight. It is too late for the United States to dispute the fact of secession or a partial disruption of the government in the revolting states during the period of the war.

We have seen that it was not, in the opinion of the United States supreme court, "a loose, unorganized rebellion," but a great "civil war," in which each of the parties had belligerent rights. And we have seen, also, the conquering power proceeding to reconstruct new state governments in the states engaged in the rebellion. Upon what ground is this power on the part of the United States to direct the organization of "new state governments" based, if not on the public law of nations, as the conqueror in the late struggle? Surely none will contend that an "unorganized, loose rebellion" would confer such power. Resistance to the just authority of government in such a case, when overcome, would leave the laws, institutions, and machinery of the state governments unaffected and ready to perform their appropriate functions, and with no new power acquired by the national government. But in this case the conquering power has said that in the late insurgent states "no legal state governments exist." Why? But one valid reason can be assigned, and that is that, by the act of withdrawal from the other states forming the United States, and their organization into a confederacy, a new government, hostile to the old government, they destroyed their character as "states of the Union," and left them at the close of the war as conquered public enemies, with governments *de facto*, subject to the will of the conqueror. In the meantime it must be remembered that the United States government lost none of its rights, authority, or jurisdiction over the territory and people of the insurgent states by reason of their withdrawal; the

---

---

government was only prevented by force for a time from exercising them.

The United States never acknowledged their right to secede, but, on the contrary, persistently denied it; and the fact of their being out was incontestibly established by the blood and treasure which it cost to bring them back.

To recur once more to the opinion from which I have so largely drawn, (Prize Cases, 2 Black): "Several of these states," said Mr. Justice GRIER, "have combined to form a new confederacy, claiming to be acknowledged by the world as a sovereign state. Their right to do so is now being decided by wager of battle." The thing was done, the right to do it was denied, and that question of right was decided by wager of battle against the confederacy.

The conquering power has now a right to demand that the policy which they were constrained to adopt during the war, as well as subsequent measures, shall be respected. It is a part of the history of the war, known to this court and to the whole civilized world, notwithstanding some feeble denials, that slavery was the cause which produced it. There may have been and probably were other objects and purposes in the mind of a few of the leaders of the rebellion; but the masses of the people of the South, who engaged in the struggle, as a vast majority did, either voluntarily or by compulsion, did believe, as they were told by the most prominent actors in getting up the great drama, that the separation was necessary to the security of the institution of slavery.

No other wrong was complained of against the non-slave states, except their alleged disposition to war upon the rights and interests of the South in respect to this institution; and I do not believe that upon any other ground or pretext the people of the South could have been persuaded or induced to engage in rebellion against a government to which no one of them could impute an act of oppression or injustice to any state or citizen.

When the war occurred it was the business of the United States to take such measures as would most certainly, in its judgment, overcome the rebellion.

The war had progressed with varied success for nearly eighteen months, and had assumed vast proportions on either side, before it was determined upon, as a measure of war, by the United States, to declare the emancipation of the slaves of the South. It was of course, so far as the power was concerned, predicated solely upon the rights of the government under the laws of war. That it was felt to be an act of justice to the slaves, when made necessary by the exigencies of the war, by the President of the United States, may be inferred from the last paragraph in his memorable and final proclamation of emancipation of the 1st January, 1863, and that as a measure of war it was resorted to.

It has been said in argument that the President could have meant no more by his proclamation than an invitation to the slaves to engage in the war on the side of the government against their masters; that he could not have believed that under the constitution he had the power to declare their freedom upon the success of the national arms. I can but regard this as an injustice to the memory and character of that illustrious man. He was the executive head of the United States, commander-in-chief of the army and navy, sworn to execute the laws, to suppress rebellion and repel invasion; he found himself confronted by a rebellion embracing eleven states in open resistance to the national authority. These states had organized a hostile government, which had initiated and was prosecuting against the United States a gigantic war for its final overthrow; a rebellion and war initiated and carried on in the interests of slavery; a contest in fact between freedom and slavery, and which demanded every energy and resource which the executive possessed or could command to sustain even the existence of the government; and, after

long deliberation with his cabinet and the representatives and senators of the loyal states, determined, as a necessary and proper measure of war, to make war upon the institution for the interests of which the national life was assailed.

And what is the purport of this great instrument, which will through time, no matter what may be said to the contrary, be regarded as the fiat of freedom to four millions of slaves and to their descendants forever?

After reciting the preliminary proclamation of the 22d of September, the proclamation of the 1st of January, 1863, proceeds: "Now, therefore, I, Abraham Lincoln, President of the United States, by virtue of the power in me vested, as commander-in-chief of the army and navy of the United States, in time of actual armed rebellion against the authority and government of the United States, and as a fit and necessary war measure for suppressing said rebellion, do, on this 1st day of January, in the year 1863, and in accordance with my purpose so to do, publicly proclaimed for the full period of one hundred days from the day first above mentioned, order and designate, as the states and parts of states wherein the people thereof respectively are this day in rebellion against the United States, the following, to wit:" (then mentioning the states and parts of states, including Texas) proceeds: "And by virtue of the power, and for the purpose aforesaid, I do order and declare, that all persons held as slaves within said designated states and parts of states are, and henceforward shall be, free;" and then this noblest paper since the declaration of independence by our forefathers, and which, like that, was to be sustained and enforced at the cost of blood and treasure, concludes with this solemn assertion and invocation: "and upon this act, sincerely believed to be an act of justice, warranted by the constitution upon military necessity, I invoke the considerate judgment of mankind and the gracious favor of Almighty God."

And yet we are told that this could not have been meant seriously.   A president, acting under the obligations of his oath of office, in the midst of a war which threatened the existence of the government, and in reference to the very cause of the war, declaring it to be a fit and necessary war measure, that the slaves in the revolting states "are and henceforward shall be free," and then solemnly invoking the considerate judgment of mankind and the gracious favor of Almighty God, was, in my judgment, the most imposing, responsible, and noble act ever performed by a president of the United States, and will ever be so regarded in the history of our country.   It received the approbation of the christian world and the favor of the God of battles.

And can it be thought that while the President could not, as a war measure, constitutionally destroy the property in slaves of those engaged in rebellion, he could employ that same property as soldiers to make war upon the owners? If this be so, it rests upon some principle entirely unknown to writers upon international law and the laws of war.

How was the act "warranted by the constitution upon military necessity?" No intelligent man would seek in the constitution for a detailed or general statement of the war powers of this government, for they are never expressed in the constitution of any government. The power to make and to resist war is necessarily inherent in all governments, and when the declaration of war is made by the proper authority, it carries with it and draws to the government every right and all the powers of a belligerent under the laws of war and the public law of nations.

The provisions of the constitution of the United States upon this subject are to this effect, as contained in the specific grants of power to the congress, viz:

"To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;

"To raise and support armies, but no appropriation of

money to that use shall be for a longer term than two years;

"To provide and maintain a navy;

"To make rules for the government and regulation of the land and naval forces;

"To provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions;

"To provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States," &c. (Nos. 11, 12, 13, 14, 15 and 16 of the enumerated powers, sec. 8, art. I, Paschal's Annot. Const.) To which may be added the first clause of the 2d section of article II, which provides that "the President shall be commander-in-chief of the army and navy of the United States and of the militia of the several States when called into the actual service of the United States," &c.

Now, if it were true that no power could be properly exercised by the government when engaged in war except those expressed in the above provisions, construed as excluding all incidental powers resulting from the laws of war, its condition would be deplorable, if not utterly hopeless.

It is a well-established rule of the public law of nations that, "from the moment one state is at war with another, it has, on general principles, a right to seize on all the enemy's property, of whatever kind and wheresoever found, and to appropriate the property thus taken to its own use or to that of the captors." (Law. Wheat. on Int. Law.)

The President, as commander-in-chief of the army and navy, and his subordinate military and naval officers, were not dependent upon the constitution or acts of congress for the manner in which the war was to be conducted, or the plans and policies during its progress which they might deem best calculated to bring it to a successful ter-

mination, always provided their action did not transcend the recognized laws of war and the laws of congress; that congress might by legislation have modified the rights of the government under the laws of war may be admitted. It is enough that it was not done. On the contrary, the entire legislation of congress, both before and after the issuance of the proclamation, furnishes indubitable evidence of the approval and concurrence of that department of the government in the act.

I maintain that it had the sanction of every department of the government.

The authority to issue it is, I think, fully borne out by the opinion of the majority of the supreme court of the United States in the Prize Cases, 2 Black; and that it met the full sanction and concurrence of congress and of the people of the nation is established beyond question.

This proclamation of emancipation, thus warranted by the laws of war, fully expressed the will of the United States government as a belligerent upon the subject embraced in it. It was, that from and after that date the former slaves in the insurrectionary states and districts (including Texas) should thenceforth be forever free.

None will dispute the fact that its enforcement depended entirely upon the success of the armies of the United States over those of the Confederate States. It could only be made effectual by force of arms. But if it was a measure allowable by the laws of war, and emanated from and was authorized by proper authority, and was carried into effect by force of arms, it was thenceforth the law of the land, unless abrogated by the conquering power.

It was a proper war measure, for it is allowable for one belligerent to dispossess the opposing belligerent of whatever conduces to his strength. Property generally is a legitimate prize of war, and especially such as will tend to strengthen the captor or weaken his adversary. (Wheat. on Int. Law, 598.)

All must admit that a heavy blow was inflicted upon the rebellion by this proclamation—one under which it staggered and finally fell.

Was it issued by proper authority? The war-making power of the government sanctioned it, and the executive and commander-in-chief of its armies, then numbering in the field four hundred thousand men, engaged in deadly strife with the owners of these slaves, constituting the most influential portion of the Confederate government, issued and promulgated it.

What legal effect is now to be given to it? Is it to be respected by the courts of this state, or shall they deny its binding force? I am of opinion that it is not waste paper, and will never be so considered while republican government is maintained in this country. I have said that the force and effect of the proclamation depended upon the success of the arms of the United States; but it is equally true that success did give it effect. The United States, in the contest, had both sovereign and belligerent rights. Every citizen, therefore, of Texas, was put upon notice of this proclamation, and disregarded it at his peril; we mean a flagrant and contemptuous disregard, for we can well conceive that it might and most probably would have been dangerous for a citizen at any time in Texas, prior to the actual presence of the military forces of the United States, after the close of the war, to have publicly renounced his right to his former slaves under the President's proclamation, and even more dangerous for a former slave to have attempted any assertion of his freedom.

But the inquiry is as to those who derided the power and authority of the United States and the proclamation of the President, and defiantly engaged in the traffic of the purchase and sale of former slaves. As to executed contracts of this sort, however reprehensible they may be, it is a matter of no concern to the courts of the country or to the laws of the land, provided the persons who were bought and

sold have in fact obtained their freedom. If A had bought in 1866 persons in Texas as slaves, and had paid for them $10,000, under the belief or hope that by some chance they might still be held as slaves, and, finding himself mistaken, should bring his suit to recover back the money upon the warranty of title that they were slaves for life, he would be informed that he had engaged in a contract against law, public policy, and humanity, and therefore could receive no aid from a court of justice.

Does the party who sues to recover the purchase-money for persons sold in this state as slaves at that date occupy a better position? I think not. He knew when the sale was made that the United States government, his rightful sovereign, had declared them free; but he put himself upon the chances of the success of the revolution and overthrow of the authority of the United States. There let him rest. He and all others similarly situated ought not to ask the courts of the country to aid them in the consummation of an outrage upon humanity, and a flagrant insult to a much-injured and forbearing government.

The question here is not as to the moment of time when the former slaves in Texas actually obtained their freedom by the events of the war; but it is whether now the courts will aid in carrying out and enforcing contracts against the public policy of the government, pronounced in the most solemn form as both sovereign and belligerent in a great civil war.

It is very true that if the United States had failed in the contest the former slaves would not now be free, for this right of declaring them free, as a measure of war, rested upon precisely the same means for its enforcement that every other right which they claimed in the southern states of necessity rested: that means was their military force. All their rights of property, jurisdiction, and sovereignty in the revolted states had to be thus determined. It will not be controverted that a law passed by the congress of the United

States during the war, levying a tax upon the insurrection-
ary states for an annual amount fixed for each of said states,
could be collected.   This, in fact, was done, and has been
in part paid; at least in this state.   This law was as much
dependent for its final execution upon force as was the de-
liverance of the slaves from bondage under the proclama-
tion.   All war measures depended upon force as the means
to give them effect.

This act, as important as any in the history of nations in
modern times, was put into practical force and effect im-
mediately upon the suppression of the rebellion.   It was
acquiesced in by the whole people of the nation, north and
south, who beheld the grand spectacle of four millions of
bondsmen, by virtue of its provisions, coupled with the pres-
ence of actual power which gave it efficacy, suddenly trans-
formed into citizens breathing the air of freedom.

Still I am told that this cannot be so, because the consti-
tution would not permit it.   I reply the living historical
fact that the thing was accomplished, a fact known to all
the world; and while I believe that there was full constitu-
tional authority for the act as a war measure, yet, even if I
doubted this, I would not as a judicial officer deny the
binding force of a great public act of the executive and
commander-in-chief of the army and navy, performed in
time of war for the safety of the nation, sanctioned directly
or indirectly by every department of the government, and
approved or acquiesced in by the whole people, and ap-
plauded by the civilized world.   There is no ingenuity of
reasoning, no power of logic, that will ever be able to over-
turn the fact, that by force of arms, authorized by the pro-
clamation, slavery was destroyed in Texas.

We have been referred to many authorities in support of
the proposition that these contracts should be enforced, but
to my mind none are applicable to the case.

We are referred to the opinions of Chief Justice CHASE
in the matter of Elizabeth, in Maryland, and of Mr. Justice

SWAYNE in the case of the United States v. Rhodes, in Kentucky, as establishing the proposition that slavery was not abolished in Texas or elsewhere in the south until the adoption of the XIIIth article of amendment to the constitution. These cases do not touch the question of the effect of the proclamation of emancipation, for the simple reason that the states where they originated and were determined (Maryland and Kentucky) were not included in the proclamation of emancipation.

The question of the freedom of the parties concerned in these cases was, therefore, properly rested on the XIIIth contitutional amendment.

It has been urged in argument, also, that the XIIIth amendment was proposed and adopted to accomplish what the proclamation and the successful arms of the government had failed to accomplish. I do not so understand it. There were certain states and districts, or portions of states, not included in the proclamation, where slavery continued to exist, in fact and in law, after the close of the war, and the sense of the nation, after witnessing the harvest of blood which the institution had produced, was unwilling that it should exist any longer anywhere within the jurisdiction of the government, and to extinguish it in those states and districts, and to prevent its re-establishment for all time to come anywhere in any of the states or territories, was the object of its adoption.

I am asked to point to the provisions in the constitution of the United States which authorized the proclamation. If I have made myself understood, this has been answered. But, in further answer, I reply, The same provisions which conferred authority upon the President to send hostile armies into the midst of the southern states to make war, to seize and destroy property, and, if need be, to desolate the land to maintain the national authority.

These things could not have been done in time of peace, any more than the emancipation of slavery, without a viola-

tion of the constitution, but in time of war they were properly done.

The contract sued on was, in my opinion, entered into against the public policy, rightfully proclaimed in time of war, for the salvation of the government, and should receive no countenance in any court of this country.

CALDWELL, J.—I concur fully in the conclusion, as well as the reasonings by which it is arrived at, and desire the opinion to be regarded as my dissent from that delivered by the chief justice.

JUDGMENTS AFFIRMED.