## C. W. WHITIS v. H. POLK.

1. When mutual contracts are not fully and definitely expressed, the law requires that such a construction be placed upon them as will secure to each party equal and exact justice. See this case for an illustration of the application of this principle.

2. In May, 1864, W., a citizen of Texas, proposed to P., also a citizen of Texas, that if the latter would buy a certain lot of cotton, he, W., would bear all the expense of transporting it from the interior of Texas to the Mexican market, and selling it; and would account to P. for one-half of the proceeds to be derived from the sale of the cotton in Mexico. P. accepted the proposition, purchased the cotton, and delivered it to W., who took it by way of Piedras Negras into Mexico, whence it was ultimately forwarded to New York and sold. P. sued W. for half of the alleged gross proceeds of the cotton. *Held,* that the contract must be con-

strued to have constituted the parties equal half owners of the cotton when it reached Piedras Negras, the first Mexican market for cotton: that, inasmuch as the plaintiff's pleadings recognized that the defendant was invested with the discretion to sell the cotton in any market he might select, this establishes the fact that either the relation of partners or that of principal and agent subsisted between the parties : hence, conceding the legality of the contract, the plaintiff was bound to sustain one-half of all expense or loss incurred upon the cotton after it was sent forward from Piedras Negras. But *held further*, that the contract and the entire transaction between the plaintiff and the defendant, for the exportation of the cotton beyond the limits of the United States, were in violation of the revenue laws of the United States, and of the policy of the United States during the rebellion; and as the nature of the contract and the character of the transaction are apparent on the face of the plaintiff's petition, the court below erred in overruling the defendant's demurrer and motion to dismiss, which assigned the illegality of the contract and transaction alleged by the plaintiff : wherefore the judgment below is reversed, and the cause is dismissed by this court.

3  Though citizens of Texas, residing therein, may to some extent have been excusable for recognizing the usurped authority of the Confederate States *de facto* government, yet they were by no means absolved from their allegiance to the government of the United States, nor from their duty to obey its laws during the rebellion.

4. A direct United States tax on cotton was in force in Texas in 1864 ; and though it could not then be paid in Texas by reason of the previous expulsion of the United States revenue officers by the State and her citizens, yet any contract to export cotton to Mexico, without payment of the tax, was necessarily in violation of the law of the United States imposing the tax, and was therefore null and void. The remark to the contrary, made by this court in Kottwitz *v.* Alexander, 34 Texas, 689, was an *obiter dictum*.

5. The public policy of the United States, during the rebellion, interdicted all commerce between the rebel States or their citizens and the outside world, so that all aid and comfort might be cut off, to the end that the rebel power might be the sooner subdued and the insurgent citizens constrained to their rightful allegiance to the United States; and the contract sued on in this case, and above indicated, was in direct conflict with this public policy, and is therefore void and cannot be enforced. *Held further*, for reasons elaborated in the opinion, that the contract and the whole transaction were in aid of the rebellion, and were therefore treasonable and void.


APPEAL from Travis.   Tried below before the Hon. J. P. Richardson.

This suit was instituted by Headley Polk, the appellee, on the 30th of November, 1867, against C. W. Whitis, the appellant.

The original petition of Polk alleged that about the — day of ———, 1864, he entered into an agreement with Whitis by which he undertook to deliver to Whitis a quantity of cotton, to be transported to Mexico and there sold, or to be shipped to Liverpool, England, for sale, Whitis undertaking all expenses of transportation and shipment, and all costs and charges of sale and of remittance of proceeds to Texas. That to reimburse Whitis for his outlays of such costs and expenses, and to compensate him for his trouble, petitioner agreed to allow him to retain one-half of the gross proceeds of the cotton, the other half to be paid to petitioner by Whitis. That Whitis agreed to take charge of the cotton, transport it to Mexico at his own expense, and to " obtain from the proper authorities permission to transport the " same beyond the limits of the then Confederate States of " America," and to sell the same or cause it to be shipped to Liverpool, England, at his own cost and expense, and, whether sold in Mexico or England, to pay petitioner one-half of the gross proceeds. That, on these terms, about the — day of May, 1864, petitioner delivered to Whitis 33,965 pounds of cotton, and Whitis took charge of the same. That, as petitioner is informed, Whitis did cause the cotton to be transported to Matamoros, in Mexico, and thence caused it to be shipped to a foreign market unknown to petitioner, and, from the sale of it, had realized a large sum of money, and retained the whole thereof in his own possession. That in the markets of this continent as well as those of Europe, the cotton was then worth one dollar and twenty-five cents per pound in United States currency, aggregating forty-two thousand four hundred and fifty-six dollars and twenty-five cents, and that Whitis realized that sum from its proceeds. That one-half of that sum is due petitioner from Whitis, but he, though requested, refuses to pay the same, &c.

On March 6th, 1868, the defendant filed a general demurrer

to the original petition ; and on the 26th of September, 1868, he filed a motion to strike the cause from the docket, because the petition showed no cause of action, and because the court had no jurisdiction to try the cause.

On the 30th of September, 1868, the plaintiff filed an amended petition, in which he stated that the agreement between him and the defendant had been misdescribed in his original petition ; and, by this amended petition, he alleged that about the — day of May, 1864, he entered into an agreement with the defendant, whereby he contracted to deliver to the defendant a certain lot of cotton, to be transported by the defendant to market and sold. That, by the agreement, the defendant undertook to transport the cotton to market at his own sole cost, and at his own sole cost to sell it ; and that, in consideration of such costs and expenses to be incurred by the defendant, and of his labor and services in the premises, the defendant should be entitled to take and retain for his own use one-half of the gross proceeds of the cotton, and upon making sale of the cotton, should pay over to plaintiff the other half of the gross proceeds. That, in pursuance of the agreement, he, the plaintiff, did, on the said — day of May, 1864, deliver to the defendant the lot of cotton mentioned, consisting of one hundred and five bales, containing fifty-one thousand three hundred pounds, of good grade and quality, and in good order and condition. That the defendant received the cotton when delivered as aforesaid, and transported the same to a market, to wit: to the City of New York, in the State of New York, and there, on or about the — day of December, 1864, sold the same at one dollar per pound, realizing the gross sum of fifty-one thousand three hundred dollars, and, by means thereof, became liable to plaintiff for one-half of the said sum.

By subsequent averments in this amended petition, the plaintiff alleged that the defendant sold or disposed of the cotton at some place or market unknown to the plaintiff, and sought a recovery as upon a *quantum valebat.*

On the 2d of October, 1868, the defendant's motion to dismiss was argued by counsel, and was overruled by the court.

On September 14th, 1869, the defendant amended, and filed a general denial, and also a special answer. In the special answer he alleged that he never made any such agreement as charged by the plaintiff; but, on the contrary, that the defendant, being a conscript under the law of the Confederate States, and subject to military duty in the Confederate army, was detailed for service to said government in getting cotton out of the country for the purpose of getting supplies for the army. That defendant was so engaged in the year 1864 as the agent of Major S. Hart, who was chief of what was known as the Cotton Bureau of said Confederate government for the State of Texas; that by reason of defendant's said agency, he had facilities for getting and protecting transportation for cotton to the Rio Grande. .That the Cotton Bureau at that time required one-half of all cotton exported from the State to be delivered to said Bureau for the purposes of the Confederate government; in consideration of which the other half was permitted to be exported, and the transportation therefor was exempted from impressment. That the plaintiff applied to him for aid in getting some cotton to a foreign market, and proposed to purchase a lot of cotton if defendant would procure it transportation and protect it from impressment by the authorities of the Confederate government. That plaintiff thereupon purchased the cotton, and the money to pay for the same was furnished partly by him and partly by this defendant, in the proportion of two thousand three hundred dollars by the former and one thousand three hundred dollars by the latter. That the agreement was that defendant should procure permits for the export of the cotton, protect it and the transportation from seizure by the government; and that the net proceeds of the cotton should be divided equally between them. That defendant fully performed his part of the agreement, and caused the cotton to be transported to the city of New York, where it was sold; and he avers that he expended a large sum of money in the transportation, and customs, and exactions of the Confederate government, and that the same has not been refunded to him by the sale of the cotton.

At the April term, 1870, an auditor was appointed by the court on the motion of the defendant, and over the protest and exceptions of the plaintiff. In the subsequent progress of the case the auditor made a report to which the plaintiff excepted on numerous grounds, but the exceptions were overruled, and the report was admitted as evidence for the defendant before the jury.

On October 12th, 1870, the defendant again amended his answers, repeating in the main the allegations made by him in his special answer previously filed; but averring that the understanding between him and the plaintiff was, that if the cotton was sold on its arrival in Mexico, the proceeds should be equally divided between them; as the cost of the permits, and of the transportation, and the defendant's personal services, to the Rio Grande, were equal to one-half the cotton; but that, as the plaintiff had failed to furnish all the money to pay for the cotton, and as defendant had furnished about one thousand three hundred dollars out of the three thousand six hundred dollars purchase-money, defendant was to have in the proceeds an additional interest in proportion to the purchase-money furnished by him. That defendant was to exercise his best judgment in selling the cotton in Mexico or shipping it to some other market for sale; and if he deemed it best to ship the cotton to another market than Mexico, then all the expenses accruing beyond the limits of Texas were to be paid out of the proceeds, and the net proceeds were to be divided between him and plaintiff, and that losses were to be borne in the like proportion. That defendant procured permits at a cost of three thousand eight hundred and thirty-two dollars in coin, which was equal to the value of that portion of the cotton which the authorities demanded for permission to export the remainder; that he furnished the transportation to the Rio Grande at his cost of one thousand seven hundred and thirty-nine dollars coin; that he paid Confederate export duty, one hundred and fifty-six dollars coin, and the Mexican customs, amounting to eight hundred dollars in coin. That after getting the cotton into

Mexico, the disturbed condition of that country, in consequence of the war then being waged between different factions, and the high price of cotton in other markets, determined defendant to forward the cotton to another market, and accordingly it was sent forward to Matamoros, and thence shipped to New York, consigned to P. Harmony, Nephews & Co. That defendant's outlay in transporting the cotton after its arrival in Mexico, and until it was placed on shipboard off the port of Matamoros, amounted to eleven thousand three hundred dollars in coin, which were then worth twenty-five thousand eight hundred and ninety-five dollars in United States currency.

The defendant then proceeded to allege an unexpected decline in the New York market, resulting in a sale of the cotton there at a great loss. That he had expended five thousand dollars more than the cotton realized, and he reconvened for one-half of that sum, and also for the amount of the purchase-money which he alleged to have been furnished by him.

Upon the pleadings thus made up, the cause came to trial by a jury at the October term, 1870—the defendant's demurrer to the plaintiff's petition having been overruled.

B. B. Garth, a witness for the plaintiff, testified that he was at the plaintiff's mill in Caldwell county, in the early part of the year 1864, when the defendant came there to see the plaintiff in reference to getting O. P. Bowles's crop of cotton, for the purpose of taking it to Mexico to sell, and the defendant proposed that if the plaintiff would buy Bowles's crop of cotton, that defendant would bear all expenses incurred in transporting it to the Mexican market and selling it, and that he would account to plaintiff for one-half the proceeds derived from the sale of the cotton in Mexico; and the plaintiff, upon these terms, agreed to buy and deliver the cotton to the defendant. That some time after this conversation, and about the month of May, 1864, the plaintiff delivered to the defendant one hundred and five bales of cotton at the plantation of O. P. Bowles in Caldwell county, which cotton belonged to plaintiff, who had

purchased it from Bowles, and had paid him for it, as Bowles informed the witness.

Asa Pullen, a witness for the plaintiff, proved that about the last of April or early in May, 1864, he, in the employ of the defendant, loaded one hundred and four bales of cotton for the defendant at Bowles's gin in Caldwell county, and hauled them to Eagle Pass on the Rio Grande; could not say to whom they belonged, but when mentioned, they were called the Polk cotton, and defendant stated to witness that plaintiff was troubled about finding the money to pay Bowles for this lot of cotton.

B. G. Pulliam, witness for the plaintiff, testified that he was told by Whitis that Polk had bought Bowles's cotton, and that he, Whitis, was going to take it out, and that it was an individual business between him and Polk. Witness's understanding from Whitis was, that he was to transport the cotton to market for one-half, " that is, Polk was to furnish the cotton, " and Whitis to convey it to market for half." (Cross-examined.) " I got my information from C. W. Whitis himself " about the contract, and that it was to be on halves. One furnished the cotton, and the other shipped it, and they were " equal partners in it."

Thomas F. McKinney, a witness for the plaintiff, testified that he was acquainted with the transaction of the cotton furnished by Polk and taken to Mexico by Whitis. " I received " a letter from C. W. Whitis in the fall of 1864, written from " Monterey, Mexico, in which he stated he had sold the Polk " cotton at thirty-five cents specie per pound. I was interested " with the defendant Whitis in his profits on said cotton; there " were about one hundred bales, it may be a few over or a few " under. In the letter was a statement of the sale of the " cotton." The letter being identified by the witness was read on behalf of the plaintiff, as follows:

"Monterey, November 18th, 1864.
" Col. Thos. F. McKinney,

" Dear Sir—I beg leave to report the sale of the one hundred " and twenty bales exported by and under order and permit.

39

" from the Cotton Bureau, May, 1864, as follows, to wit: Of
" the one hundred and twenty bales Major Hart's agent sold
" eighteen bales before I reached Piedras Negras, for twenty
" one cents; the remaining one hundred and two by me, at
" Monterey, thirty-five cents.

" 102 bales, weighing 48,365 lbs., at 35c. - - $16,927 75
" 18 " " 8,406 lbs., at 21c. - - 1,765 26

" Total amount of sales - - $18,693 01
" Freight in Texas - - - $1,831 09
" Export duty - - - - 96 50
" Freight and other expenses in Mexico, 3,197 37—— 5,124 96
" Original costs of cotton (paid by Whitis) - 6,104 30

" Entire costs - - - - $11,229 26

" Profits - - - - - $7,463 75
" Which leaves $3,731 87 to your credit - - $3,731 87½

" Respectfully,

" C. W. WHITIS."

The witness McKinney testified that the one hundred and
two bales mentioned in the letter were those spoken of as the
Polk cotton.

There was much other testimony introduced by the plaintiff,
but the foregoing comprises the whole of the testimony respect-
ing the contract, and suffices to show the substance of the case
made for the plaintiff.

The defendant read in evidence the report made by the
auditor, Milton Swisher, Esq., which set forth at length the
outlays on the cotton until its disposition in New York, in the
spring of 1865, at prices which showed an excess of expenses
over the proceeds. Defendant also introduced much evidence
respecting the disturbed and dangerous condition of Mexico,
and the rate of expenses attending cotton there; also the condi-
tion of the markets there and elsewhere; the purpose of the testi-
mony being to justify his outlays and his action in the premises.

The only portion of this evidence referred to in the opinion is the testimony of John Mackey, who testified that he was present at an interview between the plaintiff and the defendant, at the residence of the defendant, on the 25th of December, 1864, after the defendant had returned from Mexico. " I heard the " defendant tell the plaintiff, in said interview, that he could " have sold the cotton at Monterey, Mexico, at a good profit, " but that he had shipped to a foreign market (New York, I " believe), believing that a much greater profit would be realized. " The plaintiff manifested entire satisfaction with the course " defendant had taken with the cotton, and seemed well pleased " with the prospect of the shipment."

Neither in this witness's testimony, nor any other evidence, was there any proof that, at the time of the interview spoken of by this witness, the plaintiff had any knowledge of the matters testified to by McKinney.

The jury found for the plaintiff in the sum of twelve thousand three hundred and eighty-five dollars and forty-seven cents (specie dollars), and judgment was rendered in accordance with the verdict. Defendant moved for a new trial, which was refused, and he appeals. Very able and elaborate arguments were filed by the several counsel for the appellant in this court, partly upon the questions treated of in the opinion, and partly upon questions of practice, which arose at the trial in the court below, but are not noticed by this court.

*Moore & Shelley, Hancock & West,* and *Pease & Turner,* for the appellant.

*T. M. Harwood,* and *Robards & Jackson,* for appellee, after some discussion of the pleadings, proceeded as follows: The important thing to ascertain is, what really was the contract between the parties? Garth's testimony answers this clearly, viz.: " The defendant proposed that if plaintiff would buy O. " P. Bowles's crop of cotton, that the defendant would bear all " the expenses incurred in transporting it to the Mexican market

" and selling it, and that he would account to plaintiff for one-
" half the proceeds derived from the sale of the cotton in Mex-
" ico; and the plaintiff, upon these terms, agreed to buy and
" deliver the cotton to the said defendant."

Pulliam's testimony corroborates Garth; and there is nothing
to the contrary in all the record, though much more to confirm
their version of it.

This, then, was what the contract was; and turning back to
what we say in our pleadings it was, the court will find in our
amended petition that we do not allege anything inconsistent
with the proof, nor anything to infect the contract with even a
putative illegality.

The question then is, Was this contract illegal when entered
into?

The brief before us says, " that it embraced within its
" terms direct aid to the Confederate States (so-called), then
" waging a ruthless war upon the government of the United
" States."

Well, if this, or even half of this be true, we give it up. If,
instead of " embracing direct aid " to the rebel States, it so
much as even contemplated indirect aid, we abandon it.

Now, the contract is clearly proven and speaks distinctly for
itself. Neither in " its terms," nor within its purview, does it
embrace " aid " of any sort to any States, or any person or cause.
It does, however, provide expressly that one-half the gross
proceeds of the cotton was to go to the plaintiff, and another
half of them to the defendant. Did not that disposition of
them appropriate all of the proceeds? What, by any possi-
bility, could remain to go in " aid " of any other person, party,
State, or cause? Did the cotton or the proceeds of it have
more than the two halves thus appropriated? These counsel
seem to think that it did. But as there is no proof in the record
that it did, and as we think the presumption at least is, that it
only had the two halves, we hold the conclusion to be inevitable
the contract must be honorably acquitted of the solemn charge
thus fulminated against it.

But was it not unlawful to take cotton out of Texas across the Rio Grande into Mexico, in the spring of 1864?

To be entirely candid, we must confess that there was a whole code of laws—if the name of law may be so prostituted—which prohibited it unless on first suffering the exactions it imposed. That code was the cotton code of the Confederate military authorities of what was called the " Trans-Mississippi Department," with its " Cotton Bureaus " and complicated machinery for pillaging the distressed people of the State.

But our courts are not now employed in vindicating that code, any more than the " stop and surrender " orders of a highway robber; nor is that the code on which our adversaries rely—so we recur to their brief.

They make a shy reference to the act of Congress of March 7th, 1864, laying a tax of two cents a pound on cotton, and making the tax a lien; but they are careful not to cite the further provisions of the same act and section, which contemplate that cotton may lawfully be transferred or transported, but provide that the lien shall follow it " in the possession of any person " whomsoever."

With somewhat more confidence they cite the act of June 30th, 1864, and quote its 180th Section. Now, when there is one obvious and conclusive answer to an argument, it is scarcely worth while to proceed with a demonstration of half-a-dozen more, not so obvious, though they may be equally conclusive. For that reason we content ourselves by pointing out that on the 30th of June, 1864, the date of this act, the contract between Polk and Whitis was nearly two months old. It was made in the first days of May, 1864—nearly two months before this act became law. On June 30th, 1864, the cotton must have been in Mexico; for Miles proves that he received the cotton from Pullen on the Rio Grande, on the 12th day of May, 1864; and it is safe to say that it was not left even over night on this side of the river, where some prowling quarter-master or agent of the rebel service might grab it. But wherever the cotton may have been, it will not be pretended that the act of

June 30th, 1864, can invalidate a contract made two months before it was passed.

Next, we find a feeble effort to make something out of the well-considered opinion of the United States Supreme Court in the case of "Mrs. Alexander's cotton," 2 Wallace, p. 404. That case certainly presents one coincidence with this case—both cases arose out of cotton. That is the one solitary feature or fact common to the two cases, or suggestive of the slightest analogy between them. Mrs. Alexander's cotton had been libeled as prize of war, and she put in her claim for its proceeds. It had been captured on Red River by a naval force of the United States, and the question was whether it was lawful maritime prize. What analogies that kind of a case can present to the one at bar, we are at a loss to perceive.

Does "Mrs. Alexander's cotton" case decide that cotton could not be the subject matter of a lawful contract between two citizens of a rebel State, during the rebellion? Does any case, has any court, National or State, ever so held? Never—not one can be adduced which so much as insinuates it.

Mrs. Alexander's cotton was held lawful prize because it was "enemies' property," and the court expressly put it upon that ground; but if it had put it on the ground that it was "cotton," what difference would it make in this case, unless it is shown that Whitis possessed the war prerogatives of the United States, or the belligerent rights of United States forces?

Passing on from this preposterous position to the next one, and we stumble on our old acquaintances the Non-Intercourse Act and Proclamation of 1861; which were the only tangible grounds on which the legality of this contract was impeached in the court below. Counsel avoid, with commendable prudence, to cite or even indicate what section, clause, or feature of the act or proclamation was violated or impugned by Polk's contract with Whitis, or by Polk's conduct in connection with this case. Subject the contract to the most stringent scrutiny possible, and still it cannot be tortured into contemplating any "intercourse" of any sort between Polk and Whitis on the one,

hand, and citizens or people of the United States upon the other.

"Whitis contracted to take Polk's cotton to Mexico, and sell "it; and to pay Polk half its gross proceeds:" that was the contract, and the whole contract. Human wit cannot distort its few and simple stipulations into conflict or antagonism with the letter or the spirit, the purview or the policy of the Non-Intercourse Act, or of the President's Proclamation for its enforcement.

Having thus met and refuted every position assumed with any definiteness, as impeaching the legality of the contract, we assume the aggressive policy, and show how well sustained we are by the courts.

The case of Kottwitz v. Alexander's Executors, came to trial before this court at its Austin term, 1869. The contract sued on in that case was impeached on very similar grounds to those alleged in argument against this one. The court delivered a careful and well considered opinion, from which we make this brief and pertinent extract, viz.: "We know of no law that "would be violated by taking cotton to Mexico in 1864." The court then proceeds to confute in the clearest and most conclusive manner, the positions now assumed in this case by opposing counsel, with reference to the legislation of the United States on these subjects; and we respectfully refer to the entire opinion of the court in this case of Kottwitz v. Alexander's Executors, as not merely sustaining us in our positions, but going much further than it is necessary for us to ask. (34 Texas, 690.)

For instance, the court says that even if it was admitted that the exportation of cotton to Mexico in 1864 was illegal, yet "it "does not follow that it is illegal to pay debts incurred in the "purchase of teams and supplies for that purpose. * * * But "we may admit further, that the plaintiff loaned the money for "the recovery of which this suit is brought, for the purpose of "enabling them to take cotton to Mexico in 1864—unless he "did something more than this, if the conveyance of the cot-

"ton was illegal, nothing would be shown to avoid the recov-
"ery of the money." And the court proceeds to review the
authorities sustaining its positions. These and other positions
go further towards sustaining the right of action than we need
contend for in the present case.

Nor is there anything in the case of Converse *v.* Miller, 33
Texas, 216, cited by opposing counsel, which in any degree
shakes these positions. The facts of that case differ, in all es-
sential respects, from those of the case at bar. In that case
the plaintiff aided and assisted his agent in the negotiation and
consummation of an arrangement to violate the blockade estab-
lished by the United States. By the arrangement itself, one-
half of the cotton was given to the rebel authorities for leave
to take out the remainder—which, says the court, "was an act
"done, not incidentally, but directly, in aid of the rebellion."

What fact or feature is there in the present case in common
with these? Polk made no terms with any one for permits,
and had no dealings with any rebel functionary. His contract
with Whitis was purely an individual one, having not the re-
motest reference to any one but themselves. Not one ounce of
his cotton ever went to the Confederate government, its author-
ities, armies, or agents; nor did his contract provide or contem-
plate that it should do so. There was no blockade of the Rio
Grande, says the Supreme Court of the United States in the
case of The Peterhoff, 5 Wallace, 28. Then, of course, the
contract could not involve or contemplate a violation of a block-
ade; nor, indeed, have counsel themselves the effrontery to con-
tend, in a direct manner, that it did or could. The nearest
they can come to doing so, is to cite a case which turned directly
on a violation of the blockade, and on a direct contribution to
the rebel authorities, and thus insinuate a charge too gross to
be avowed in the face of the facts of the present case.

The other cases cited in the brief under notice are so palpa-
bly devoid of analogy that we will not consume time in dis-
cussing them.

The true legal character of the contract in the present case

brings it fairly within the category defined by the Supreme Court of the United States in Thorington *v.* Smith, 8 Wallace, 12, as "transactions in the ordinary course of civil society, "which are without blame except when proved to have been "entered into with actual intent to further invasion or insurrec- "tion." And that supereminent tribunal says, in the same connection, that "such contracts should be enforced in the "courts of the United States, after the restoration of peace, to "the extent of their just obligation."

Nothing in all this record, from first to last, justifies even a suspicion that Polk, in his dealings with Whitis, harbored any "intent to further invasion or insurrection," or in any respect to transgress either the laws or the public policy of the United States.

A desperate effort is made to so construe the original petition as to give color to such an imputation. But the attempt is futile in every point of view. Fairly understood, the original petition is not open to the charge; but even if it was—even if it had set up a contract treasonable from beginning to end, the plaintiff had the right to amend, and by amendment to state a contract free from objection; and if he proved the contract to be as alleged in the amendment, the allegations of his original petition could not defeat his recovery. Those allegations are not "admissions" which can be used to his prejudice. For the law on this point, clearly and conclusively stated, we may rest securely on Judge Wheeler's opinion (for the whole court) in Coates *v.* Elliott, 23 Texas, 612.

In the next place we refer for a moment to the pleadings of the defendant himself, and ask the court to take notice that nowhere in his answers is it pretended that the contract provided or contemplated that the cotton should be shipped to New York, or any part of the United States. On the contrary, the defendant alleges that the contract provided for the conveyance of the cotton to Mexico or to Liverpool. It is only an afterthought and a makeshift that has prompted the persistent effort to engraft on the contract a stipulation for carrying the cotton to New York. The statement of facts shows this; for R. M.

Johnson proves when and why Whitis concluded to ship it to New York, and shows that the shipment to New York was the work of Whitis and San Roman, with which Polk had no more to do than any member of this honorable court itself.

Distrusting the success of this afterthought, there is still one more attempt made to inoculate Polk with the virus of Whitis's own and sole unlawful conduct. It is claimed that Polk "ratified" the acts of Whitis and the shipment of the cotton to New York, and Mackey's testimony is cited to establish the "ratification." This testimony amounts to but very little in any way, and to nothing at all when considered in connection with the facts. The sum and substance of it is that on some indefinite date, Whitis informed Polk that he, Whitis, had shipped the cotton to a "foreign market," which market the witness believed was New York—that they would realize a great profit thereby; and that Polk, on receiving the information, manifested entire satisfaction.

Is it pretended by any one that Whitis had informed Polk of the facts and dealings respecting the cotton, before the shipment to New York? Is it pretended that Whitis told Polk that when the cotton got to Monterey, it was only worth thirty-five cents per pound—that he, Whitis, believed there would be a profit in sending it on to Matamoros or elsewhere, and therefore he, Whitis, had bought or taken it for his own account at Monterey, at its market price there of thirty-five cents per pound? Did Whitis tell Polk that this purchase or taking of the cotton at Monterey was binding, if he, Polk, so elected; that he, Polk, had his option either to take half of the thirty-five cents per pound, or to abide the result of the shipment to New York? Did Whitis tell Polk, that not only had he, Whitis, sent the cotton to New York, but had also directed that the proceeds of it—every dollar of them—should be turned over to R. M. Johnson, for the purchase of a stock of goods in which Polk was not to have a cent of interest?

These facts and dealings, Whitis was bound, legally and morally, to make known to Polk, before Polk could say any-

thing which would bind him as a "ratification" of the shipment to New York.   (Story on Contracts, Section 161; Story on Agency, Section 239, and the numerous cases there cited.)

Again, if Whitis's shipment of the cotton to New York was illegal, as is contended by the other side, Polk could not ratify it.   An illegal act cannot be ratified.   (Story on Contracts, Section 162.)

But the truth of the matter is, that the use which our opponents seek to make of Mackey's testimony, is not to establish any "ratification" in a correct sense.   Their real effort is to prove by it a change of the contract.

From Mackey's testimony they ask the court to conclude, first, that Polk deliberately and with full knowledge of the antecedent facts, agreed to so change the contract as to make New York the destined market, instead of Mexico; and second, that he also contracted to bear half the expenses of the shipment to New York—thus changing the contract in its two most material and most definite features.   That is what, under the mild appellation of a "ratification," the court is in reality asked to infer from the vague, indefinite, and uncertain account given by Mackey of what passed between Polk and Whitis.   Look to Mackey's testimony and see how absurdly inadequate it is to sustain such a superstructure.

In the case of Butler v. Maples, 9 Wallace, there is a feature presenting a perfect analogy of principle, as well as some circumstantial similarity to this feature of the case at bar.   On page 771 of that volume, will be found the instruction given by the circuit judge to the jury, which instruction was one of the errors assigned.   On page 778, the Supreme Court, in a few brief but cogent words, silence the pretenses of the appellant, though infinitely better sustained than the similar pretenses advanced in this case.   The substance of the ruling is, that a new contract, obtained by suppression or misrepresentation of the facts, could not discharge the party from his liability under the original contract—which is precisely what our opponents contend against in the case at bar.

Now how were Polk and Whitis situated, relatively to each other, when the interview transpired of which Mackey speaks? Polk's cotton had been in Whitis's hands for a year and more. Whitis had the sole control of it, Polk was completely at his mercy. He knew nothing at all about Whitis having taken the cotton for his own account, at Monterey. Nothing he could say or do could alter or affect whatever disposition Whitis had already made of the cotton. Under these circumstances, suppose he did "manifest entire satisfaction" when Whitis told him that he had shipped the cotton to New York, and that great profit would be the result; what does it amount to? Gentlemen on the other side say that this "entire satisfaction" of Polk's infected with illegality a legal contract made long before, and can only be atoned for by his forfeiting to Whitis all his rights and interests under the contract. We say that there is no civilized country where such law could be tolerated.

The truth is, that if Mexico or Liverpool was the real destination of the cotton when it was sent out of Texas, a subsequent shipment of it from Mexico, a neutral country, to New York, was not in violation of any law whatever; and so far from being in contravention of any "public policy" of the United States, this court has itself shown, in Kottwitz v. Alexander's executors, already cited, that it was in consonance with and promotive of that policy. (Lewis v. Alexander, December term, 1870; Chambers v. Grant, December term, 1871.) Wherefore, if Polk, on the fullest deliberation and in the most solemn manner, had "ratified" the shipment from Mexico to New York, he could have incurred no penalty, either criminal or civil. And if he had, with all solemnity, approved of Whitis forwarding the cotton to New York, instead of selling it in Mexico, his contract with Whitis would, in every other respect, have remained unchanged, and Whitis would be bound to bear every cent of the expense attending the transportation and sale of the cotton.

The result is that, no matter how considered, Mackey's testimony amounts to nothing. The jury found so, and they were the judges of the facts under which the pretended ratification

was made. The attack on the judge's charge, in respect to it, is too feeble for notice—and we pass from this question.

OGDEN, J. This was an action brought by the appellee against the appellant, in 1867, to recover the price or value of a certain lot of cotton delivered to appellant in the early part of the year 1864, to·be taken to market, to be sold by appellant. The cause was submitted to a jury in the District Court, and a judgment rendered for the plaintiff below, and the defendant has brought the case to this court by an appeal.

The suit was instituted upon an alleged specific contract, and yet it is somewhat difficult to determine from the pleadings or evidence what that contract was, when entered into by the parties. Indeed, the main questions of inquiry in the court below appear to have been the character and extent of the contract sued on.

In his original petition, the plaintiff below set up the contract to be an agreement for the transportation of about thirty-three thousand pounds of cotton to market for sale, and alleges that he agreed to and did furnish defendant with the cotton, who promised to obtain permits to take the same beyond the limits of the Confederate States into Mexico, and to pay all freight and cost of shipment to Mexico, or Liverpool, England, and there sell the same, and pay to plaintiff one-half of the gross proceeds of·the sale.

In his amended petition, the plaintiff varies materially the description of the contract sued on, both as to the quantity of the cotton delivered, as well as the market to which the same was to be taken.

The defendant claims that by the contract the plaintiff was to furnish the cotton, and that he was to take it into Mexico; and that for his trouble, care, and expense of taking it across the Mexican line, he was then and there to become owner of an undivided half of said cotton, and have full power and authority to sell the whole cotton there, or at his discretion to ship the same to any other market, at the equal cost of himself and

plaintiff, and that the net proceeds of the sale, after deducting all charges and expense beyond the Mexican line, was to be equally divided.

The facts in regard to the carrying out of this disputed contract are, that the defendant below received the cotton in Caldwell county, transported it to the Rio Grande, and on the 12th of May, 1864, crossed the same at Piedras Negras into Mexico, and from thence transported the same through Mexico, by the way of Monterey, to Matamoros, and there shipped it to New York, where it was sold in 1865. And yet the jury trying the case appear to have disregarded the pleadings of plaintiff and defendant, the evidence adduced on the trial, and, on a material question, the charge of the court, and saw proper to find a verdict in disregard of all. They appear to have attempted to make a contract for the parties, that the cotton was to be transported to Monterey, Mexico, at the exclusive cost and expense of the defendant, and there sold, and the gross proceeds of the sale there divided between the plaintiff and defendant. Such an anomalous verdict, unwarranted by the pleadings, in direct conflict with the evidence, and in disregard of the charge of the court, can form no legitimate foundation for a judgment, and should have been set aside by the court trying the cause, and a new trial granted.

No specific contract is set out in the pleadings, and we have to look to the evidence to determine what that contract was, and the rights and obligations of the parties under the same. The witnesses for the plaintiff prove the contract to be substantially that the plaintiff was to buy Bowles's cotton, and deliver it to the defendant, who was to procure the necessary permits from the authorities for shipping it, and transport the same to a Mexican market at his own expense and there sell it, and the proceeds to be equally divided between the parties.

In all mutual contracts between parties, when the same are not fully and definitely expressed, the law requires such a construction placed upon them as will as nearly as possible secure to each equal and impartial justice. (See 2 Parsons on Con-

tracts, 491.)   Applying this rule to the contract as proven by plaintiff's witnesses, it is not difficult to arrive at the true extent of the same and the intent of the parties, as it is clearly established by the same testimony that, at that time, it cost one-half of the cotton to get it into Mexico ; that there was a Mexican market for cotton on the Rio Grande ; and therefore the contract as proven cannot be legally construed as compelling the defendant to transport the cotton further than the first Mexican market, and this appears to have been the custom and price for getting cotton to Piedras Negras at that time.   We are therefore forced to the conclusion that the contract, as proven by plaintiff's witnesses, bound the defendant to transport the cotton only to Piedras Negras ; and that, when there, one-half of the cotton, or the proceeds of the sale of the same, became absolutely his, and, had he thought best, he might have sold the whole cotton and divided the proceeds with the plaintiff, or he might have sold one-half of the cotton and paid the money to plaintiff, and have done as he pleased with the other half as his own.   Therefore, had the jury found a verdict for the plaintiff for the price of one-half of the cotton at Piedras Negras, at the time it reached that place, they would have at least had some shadow of evidence to sustain their verdict.

But it is difficult to understand by what process of reason, or by what rules of law, the defendant, under all the evidence of the case, could be held bound to haul plaintiff's cotton from the Rio Grande to Monterey, at an expense of twelve or fifteen cents per pound, without compensation, and for the exclusive benefit of plaintiff.   Under the contract proven by the plaintiff, if the defendant had determined to enter upon a contract for his own benefit, and had forwarded plaintiff's cotton from Piedras Negras to Monterey, on his own account, he would have been entitled to all the benefits of the shipment, and the plaintiff would have been entitled to recover only the value of the same at Piedras Negras.

But we think there is another construction of the contract

sued on, more consonant with all the evidence adduced on the trial, as well as the previous and subsequent acts of the parties, and which is the only legitimate construction of which the facts are susceptible. In his original petition the plaintiff alleges that defendant was to take the cotton to a Mexican market or to Liverpool, in England, and sell the same; thus clearly admitting that the defendant had the authority to exercise his discretion as to the market. This fact establishes beyond controversy either an agency or a partnership, and though that portion of the original petition was amended, and the description of the contract changed, yet the amended petition recognized the same discretion, the evidence establishes the same thing, and his recognition of appellant's authority long subsequent to the shipment of the cotton, as proven by Mackey, should now estop him from denying the authority of defendant to act as he deemed advisable for both parties. And yet it is claimed by the plaintiff below that, though the defendant had discretion to ship or otherwise dispose of the cotton as he might think best, yet he was bound to do so at his own expense; but we do not understand this to be a legal rule of partnership or agency, unless specifically proven. It was fully established by the evidence that the cost of getting cotton to Piedras Negras, at the time the contract sued on was made, was one-half of the same. It was also proven that defendant took the cotton to Piedras Negras under the contract, and there was no proof that he was bound to move it any further; and, under that contract, appellant can be held no further liable.

At Piedras Negras the appellee and appellant became equal half owners in the cotton sent out, and whether the appellant thenceforward acted as the agent or equal partner in the cotton is quite immaterial now, as the appellee fully recognized and sanctioned his authority and his acts, and he should have been held bound by the same.

It clearly appears from the evidence that appellant used all diligence, care, and economy that could well have been exercised; that his final adventure in the shipment of the cotton to

New York was made under the immediate advice of an old shipping merchant, and this act was fully approved and affirmed by the appellee, until the unfortunate news that the adventure had proven a great loss ; and we think he should now be held to bear his proportion of that loss.

This view of the contract as alleged and proven, and the general merits of the cause, render it unnecessary that we should further notice specifically the various assignments of errors in the court below.

But there is one view of this case which we do not feel at liberty to disregard, and especially as in our opinion it should have been decisive of the whole case.    The first and second assignments are to the rulings of the court in overruling defendant's demurrer and motion to dismiss.    It is claimed by counsel that the contract set out in plaintiff's original and amended petition was in fraud of the revenue laws and against the public policy of the United States ; that it was made in aid of the late rebellion, and was therefore null and void.    This contract was made in 1864, by and between citizens of the State of Texas, and though they were residents within the limits of the so-called Confederate States, and may have been held to some extent excusable for recognizing that usurped authority, and for obeying for the time being the laws and regulations of that *de facto* government, yet they were by no means absolved from their allegiance to the government of the United States, nor their obligations to observe and obey its laws and regulations.

In the case of White & Chiles (25 Texas Supplement), Chief Justice Chase, in delivering the opinion of the court, says: " The ordinance of secession adopted by the convention, rati- " fied by a majority of the citizens of Texas, and all acts of its " Legislature intended to give effect to that ordinance, were ab- " solutely null. * * * The obligation of the State, as a member of " the Union, and of every citizen of the State as a citizen of " the United States, remained perfect and unimpaired." And if their obligations were unimpaired then they were legally

40

bound to obey all the laws and regulations which any other citizen of the United States was, and no citizen of the United States has ever been permitted to go into the courts for the enforcement of a contract made in violation of any of the laws of the country.

When an illegal contract has been fully executed the courts will not interfere to litigate the claims of parties who may have been injured thereby, nor will they take jurisdiction to enforce an executory contract which is in any manner tainted with fraud or illegality. The contract sued on was made in 1864, to transport cotton from Texas to Mexico to market; and at that time there was levied by the laws of the United States a heavy duty on all cotton raised in this State, and by the same law a severe penalty was attached to the removal of said cotton from the place of production until the revenue dues had been paid. It is also historically known and may be judicially recognized as a fact, that at the time of making this contract all Federal revenue officers had been expelled from Texas and the Mexican borders, and the parties must have made the contract with a direct view of evading those revenue laws, as the law prohibited the removal of cotton until the duties were paid, and the contract was to remove when both parties knew the duties could not be paid. The dictum of the learned judge in Kottwitz v. Alexander (34 Texas, 689), that " we know of no law that would be violated by taking cotton " to Mexico in 1864," was unnecessary to the decision of the case then before the court, and was probably made without a due consideration of the laws of the United States, and we are more inclined to adhere to the positive mandates of the law, though we should disagree with that dictum. That there was no revenue officer to receive the tax was not the fault of the government, but the fault of the State and the citizens thereof, and the parties should not be heard to plead an excuse on that account. And if they entered into a contract to ship a quantity of cotton to Mexico, or to Liverpool, or New York, without paying the revenue dues, and they, with the rest of the citizens of the State,

had expelled the revenue officers from the State, so that the dues could not be collected, that contract must be held so tainted with illegality that the courts will not lend their aid to enforce the same or any part thereof.

Again, the public policy of the United States during the war, was to stop all commerce or trade by the rebel States or the citizens thereof with the outside world, to prevent all intercourse whatever—even with neutral governments—that all aid or comfort might be cut off, to the end that the rebel power might the sooner be put down and the citizens forced to their rightful allegiance.  This was a policy the government had a right to inaugurate, and to put in force to any extent.  The contract sued on was in direct conflict with this policy, and for that reason is entitled to no favorable consideration by the courts.  That contracts against the law and public policy cannot be enforced is fully recognized in Cassell v. Hall, 7 Wallace, 543, and in Hanauer v. Doane, 12 Wallace, 342; Hunt's heirs v. Hunt, 1 Texas, 758, Goodman v. McGehee, 31 Texas, 253, and Griswold v. Wadington, 16 Johnson, 438.

Again, if this contract was made in aid of the then existing rebellion, it was null and void, and should not now be enforced. This doctrine has been so often, and with so great unanimity announced by almost every court in the country, that we deem it unnecessary to refer to but few authorities.  In the case of Hanauer v. Doane, 12 Wallace, Justice Bradley, after a very thorough examination of authorities on that question, comes to the conclusion that " he who, being bound by his allegiance to " a government, sells goods to an agent of an armed combina- " tion to overthrow that government, knowing that the pur- " chaser buys them for that treasonable purpose," or does any other act to aid that combination, " is himself guilty of treason " or misprision thereof."  The appellee in this case, knowing that the only resource for the Confederate army in obtaining clothing and supplies, consisted in the cotton of the country, and knowing also that very rigid exactions were laid upon all cotton in the State by the Confederate authorities, even to one-

half of the entire crop, and knowing also that no cotton could be got out of the country without satisfying those exactions in one way or the other, voluntarily purchased Bowles's cotton for the purpose of sending the same out of the country to market, and then made a bargain with the appellant to pay the Confederate exactions, and procure what were known as permits for sending the same beyond the Confederate lines, and at the same time knowing that the whole transaction was in direct violation of the laws and public policy of the United States, can now hardly plead innocence, or an exemption from the legitimate consequence of his acts. He is to all intents and purposes as culpable as though his contract had been made directly with the Confederate authorities, in which he had bound himself to buy cotton and give one-half to the Confederacy for permits to ship the other half; and the one entered into was in direct aid of the rebellion, to a very large amount. It is entirely immaterial how appellant procured the permits from the Confederate agents, or whether the Confederacy was paid a part of the identical cotton turned over by appellee, or whether it was paid out of other cotton, or in money; yet the permits represented the interest of the Confederate authorities, and appellee agreed to give all that they represented; and that agreement was in aid of the rebellion, and therefore treasonable and void, and the courts cannot now be prostituted to take jurisdiction of or aid either party in the enforcement of the execution of the same. (Hanauer *v.* Doane, 12 Wallace; Goodman *v.* McGehee, 31 Texas, 254; Pridgeon *v.* Smith, 31 Texas, 171; Ransom *v.* Alexander, 31 Texas, 443; also, Emancipation cases, 31 Texas, 534.)

We are, therefore, of the opinion that the original and amended petitions of appellee, filed in the court below, showed most clearly that the contract sued on was made in violation of the laws and public policy of the United States, and in aid of the rebellion, and was therefore treasonable and void; and that the District Court should have sustained the demurrer and dismissed the cause; and for the error in

refusing to do so, the judgment is reversed and the cause dismissed.

Reversed and dismissed.

Presiding Judge Evans dissented from the decision made of this case.